No. 14-704C
(Judge Williams)

---

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ALEXANDER ALIMANESTIANU, *et al.*,

Plaintiffs,

v.

UNITED STATES,

Defendant.

---

### PLAINTIFFS' OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

---

BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI LLP

Zeb Landsman, Esq. (Attorney of Record)
Richard N. Chassin, Esq.
Jesse T. Conan, Esq.
299 Park Avenue
New York, New York 10171
zlandsman@beckerglynn.com
rchassin@beckerglynn.com
jconan@beckerglynn.com
Tel:  (212) 888-3033
Fax:  (212) 888-0255

January 22, 2015

Attorneys for the Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ..................................................................................................................................... 3

    The Taking and the Claims Settlement Agreement ................................................. 4

    Historical and Legislative Background................................................................... 5

    The United States Admission................................................................................... 7

    A Public Good and Just Compensation ................................................................. 8

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ........................................................................................................................ 11

    I.     WHEN A JUDGMENT (OR CLAIM IN TORT) IS TAKEN
           BY THE GOVERNMENT AND THEN SETTLED,
           RESULTING IN A SUBSTANTIAL PAYMENT TO THE
           GOVERNMENT, A CLASSIC TAKING REQUIRING JUST
           COMPENSATION HAS OCCURRED ..................................................... 11

           A.   Judgments on Appeal or Accrued Causes of Action Are
                 Species of Property Protected by the Fifth Amendment
                 and Cannot Be Seized by the Government Without
                 Consequence .......................................................................... 11

                i.     *A judgment on appeal or accrued cause of action is*
                     *property within the meaning of the just compensation*
                     *clause of the Fifth Amendment* .................................... 11

                ii.    *The cases relied upon by the government merely*
                     *establish that a property right is not implicated when*
                     *the government passes a law that precludes or*
                     *diminishes an accrued claim* ........................................ 12

           B.   When the Government Uses Its Power of Eminent Domain
                 to Forcibly Transfer Property from an Individual to the
                 Government, a Classic Taking Has Occurred and Just
                 Compensation Is Required; the Regulatory Takings
                 Paradigm of *Penn Central* and Its Progeny Is Not
                 Applicable.......................................................................... 17

II.    ESPOUSAL AND THE TAKINGS CLAUSE:  AN ISSUE OF
       FIRST IMPRESSION IN MODERN JURISPRUDENCE........................................ 20

       A.    Historically, Courts Recognized That When the United
             States Takes and Then Compromises the Claims of Its
             Citizens Against Foreign Nations, the Fifth Amendment
             Requires the Remuneration of Just Compensation.............................. 20

       B.    Modern Takings Jurisprudence Has Not Upset the Central
             Holding in *Gray v. United States,* 21 Ct. Cl. 340 (1886):
             The Takings Clause Requires the Government to Pay Just
             Compensation When It Takes and Compromises a Claim
             by International Agreement .............................................................. 22

             i.     *The Supreme Court has implicitly endorsed the*
                    *holding of Gray*............................................................. 22

             ii.    *The limited Federal Circuit precedent on espousal*
                    *rests on principles of law that are inapplicable here* ................... 24

             iii.   *The government has not provided an alternative forum* .............. 26

III.   THIS CASE DOES NOT PRESENT A NON-JUSTICIABLE
       POLITICAL QUESTION .......................................................................... 28

       A.    The Merits of the Claims Settlement Agreement Is Not at
             Issue ............................................................................................. 28

       B.    Reaching the Merits of the Taking Claim Does Not
             Encroach upon a Non-Justiciable Political Question ......................... 29

             i.     *The Supreme Court has already held that the political*
                    *question doctrine does not preclude consideration of*
                    *the kind of taking alleged here* ..................................... 29

             ii.    *Precedent relied on by the government is no longer*
                    *good law* .................................................................. 29

CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Abrahim-Youri v. United States,*
   139 F.3d 1462 (Fed. Cir. 1997) .................................................................. 19, 25, 27

*Acceptance Ins. Cos. v. United States,*
   583 F.3d 849 (Fed. Cir. 2009) ............................................................................ 10

*Adams v. Hinchman,*
   154 F.3d 420 (D.C. Cir. 1998) ............................................................................ 16

*Adams v. United States,*
   391 F.3d 1212 (Fed. Cir. 2004) ........................................................... 11, 12, 16, 17

*Alliance of Descendants of Tex. Land Grants v. United States,*
   37 F.3d 1478 (Fed. Cir. 1994) ............................................................................ 11

*Arbour v. Jenkins,*
   903 F.2d 416 (6th Cir. 1990) .............................................................................. 16

*Axel Johnson, Inc. v. Arthur Andersen & Co.,*
   6 F.3d 78 (2d Cir. 1993) ..................................................................................... 15

*Baker v. Carr,*
   369 U.S. 186 (1962) ........................................................................................... 29

*Bancoult v. McNamara,*
   445 F.3d 427 (D.C. Cir. 2006) ....................................................................... 30, 31

*Belk v. United States,*
   858 F.2d 706 (Fed. Cir. 1988) ....................................................................... 24, 31

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................... 10

*Brown v. Legal Found. of Wash.,*
   538 U.S. 216 (2003) ........................................................................................... 19

*Casitas Mun. Water Dist. v. United States,*
   543 F.3d 1276 (Fed. Cir. 2008) .......................................................................... 18

*Central States, Southeast & Southwest Areas Pension Fund v. Lady
   Baltimore Foods, Inc.,*
   960 F.2d 1339 (7th Cir. 1992) ............................................................................ 15

*Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
  651 F.2d 800 (1st Cir. 1981) ................................................................... 23, 26

*Comm. of U.S. Citizens Living in Nicaragua v. Reagan*,
  859 F.2d 929, 935 (D.C. Cir. 1988) ................................................................ 31

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ................................................................................. passim

*District of Columbia v. Beretta U.S.A. Corp.*,
  940 A.2d 163 (D.C. Ct. App. 2008) ................................................................ 14

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998) ...................................................................................... 18

*Gray v. United States*,
  21 Ct. Cl. 340 (1886) ............................................................................... 21, 22

*Hammond v. United States*,
  786 F.2d 8 (1st Cir. 1986) ............................................................................. 15

*Ileto v. Glock, Inc.*,
  565 F.3d 1126 (9th Cir. 2009) ....................................................................... 14

*In re Aircrash in Bali, Indonesia on Apr. 22, 1974*,
  684 F.2d 1301 (9th Cir. 1982) ....................................................................... 11

*In re TMI*,
  89 F.3d 1106 (3d Cir. 1996) .......................................................................... 16

*Langenegger v. United States*,
  756 F.2d 1565 (Fed. Cir. 1985) ................................................................. 30, 31

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) ................................................................................. 12, 18

*Lyon v. Agusta S.P.A.*,
  252 F.3d 1078 (9th Cir. 2001) ....................................................................... 15

*Marbury v. Madison*,
  5 U.S. 137 (1803) .......................................................................................... 30

*Marks v. United States*,
  15 Cl. Ct. 609 (1988) ............................................................................... 16, 26

*Mem'l Hosp. v. Heckler*,
  706 F.2d 1130 (11th Cir. 1983) ..................................................................... 16

*Nixon v. United States*,
   506 U.S. 224 (1993) ................................................................. 30

*Pa. Coal Co. v. Mahon*,
   260 U.S. 393 (1922) ................................................................. 16

*Penn Central Transp. Co. v. New York City*,
   438 U.S. 104 (1978) ................................................................. 18

*Plyler v. Moore*,
   100 F.3d 365 (4th Cir. 1996) .................................................... 15

*Pugh et al. v. The Socialist People's Libyan Arab Jamahirya, et al.*,
   Civil Action No. 02-2026-HHK ................................................. 3

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
   2009 U.S. App. LEXIS 4142 (D.C. Cir. Feb. 27, 2009) .......... 7

*Rodgers v. Tristar Prods.*,
   559 Fed. Appx. 1042 (Fed. Cir. 2012) ..................................... 15

*Salmon v. Schwarz*,
   948 F.2d 1131 (10th Cir. 1991) ................................................ 16

*Shanghai Power Co. v. United States*,
   4 Cl. Ct. 237 (Ct. Cl. 1983) ............................................... 25, 30

*Stauffer v. Brooks Bros. Grp.*,
   758 F.3d 1314 (D.C. Dir. 2014) ............................................... 15

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
   560 U.S. 702 (2010) ................................................................. 17

*Tonya K. v. Bd. of Educ. of the City of Chicago*,
   847 F.2d 1243 (7th Cir. 1988) .................................................. 15

*Tulsa Prof'l Collection Servs., Inc. v. Pope*,
   485 U.S. 478 (1988) ................................................................. 11

*United States v. Sperry Corp.*,
   493 U.S. 52 (1989) .............................................................. 23, 29

*Zivotofsky v. Clinton*,
   132 S. Ct. 1421 (2012) ....................................................... 29, 30

## Other Authorities

Paul Finkelman, Foreign Law and American Constitutional Interpretation:
A Long and Venerable Tradition, 63 N.Y.U. Ann. Surv. Am. L. 29, 45
(2007) ................................................................................................................... 22

Peter Onuf & Nicholas Onuf, Federal Union, Modern World: The Law of
Nations in an Age of Revolutions 1776-1814, at 11 (1993) .................................. 22

Robert J. Reinstein, Executive Power and The Law Of Nations in the
Washington Administration, 46 U. Rich. L. Rev. 373, 404 (2012) ........................ 22

## Treatises

Emer de Vattel, The Law of Nations, Book IV, Ch. 2, § 12........................................ 22

## Appendix

Exhibit 1:

Claims Settlement Agreement between the United States and The Socialist
People's Libyan Arab Jamahirya, dated August 14, 2008 (the "Claims
Settlement Agreement") ................................................................... 4, 5, 8, 24, 25

Exhibit 2:

A 2011 report authored by the Congressional Research Service for
members of Congress summarizing the historical backdrop that led to
the Claims Settlement Agreement......................................................................... 5, 6

Exhibit 3:

Libyan Claims Resolution Act, dated August 4, 2008.................................................. 6

Exhibit 4:

Certification under Section 5(A)(2) of the Libyan Claims Resolution Act
Relating to the Receipt of Funds for Settlement of Claims Against
Libya, signed by Secretary of State Condoleezza Rice on October 31,
2008 .......................................................................................................................... 7

Exhibit 5:

United States' Motion to Intervene, Vacated Judgment, and Dismiss Suit
with Prejudice in Pugh v. Socialist People's Libyan Arab Jamahiriya
(D.C. Cir. Case Nos. 08-5387, 08-5388) filed on January 9, 2009 ...................... 7, 8

Exhibit 6:

Referral letter from the Department of State to the Hon. Mauricio J.
    Tamargo, chairman of the Foreign Claims Settlement Commission of
    the United States, dated January 15, 2009...........................................................................8, 9

Exhibit 7:

Executive Order: Settlement of Claims Against Libya, dated October 31,
    2008 ...................................................................................................................................17

## PRELIMINARY STATEMENT

The plaintiffs in this lawsuit (the "Alimanestianu Plaintiffs") are all close relatives of Mihai Alimanestianu ("Mihai"), an American and victim of state-sponsored terror.  Mihai was killed in 1989 by agents of The Socialist People's Libyan Arab Jamahirya ("Libya") when they downed UTA Flight 772 in southeastern Niger, killing all onboard.

In 1996, Congress amended the Foreign Sovereign Immunities Act ("FSIA") by removing the jurisdictional immunity of Libya and other designated state sponsors of terror to allow victims and their families to seek monetary damages for acts of terror.  Prior to 1996, American victims of Libyan terror had claims against Libya but no forum, either in the United States or abroad.  The 1996 amendments to FSIA provided that forum.  In 2002, the Alimanestianu Plaintiffs filed a lawsuit against Libya for the 1989 bombing.  On August 8, 2008, after years of contested litigation, the United States District Court for the District of Columbia awarded the Alimanestianu Plaintiffs, collectively, a $1.3 billion judgment.  Libya appealed. Days later, the judgment was taken by the United States and compromised.

The taking occurred on August 14, 2008, when the United States entered a Claims Settlement Agreement with Libya.  The agreement came in the context of restoring full diplomatic, legal, and commercial relations between Libya and the United States and provides that it was entered "to further the process of normalization of relations on the basis of equality and mutual benefit."  As part of that agreement, the United States took and settled the claims (including judgments on appeal) of U.S. nationals against Libya arising out of Libya's decades-long campaign of terror.  In an executive order, dated October 31, 2008, President George W. Bush explained that as a result "no United States national may assert or maintain any claim . . . *in any forum, domestic or foreign*."

Subsequently, on October 31, 2008, Libya's sovereign immunity was restored; from the Alimanestianu Plaintiffs' perspective, a meaningless act given that the U.S. had already taken and compromised their judgment.  As compensation for the $1.3 billion judgment, the United States elected to pay nothing to four of the Alimanestianu Plaintiffs, $200,000 to four of the Alimanestianu Plaintiffs, and $10 million to the Estate of Mihai.

The government's motion contends that this case should be dismissed because (1) the plaintiffs have not alleged a cognizable property interest; (2) the judgment was not taken; and (3) the case presents a non-justiciable political question.  The motion should be denied.

In Section I, we show that when a judgment on appeal or accrued cause of action is seized and compromised by the United States, a taking implicating the Fifth Amendment has occurred.  While numerous cases have found that judgments on appeal or accrued claims are not "vested" for purposes of the takings clause, in none of those cases did the government actually take possession of and use the claims at issue.  In each case relied upon by the government, a cause of action or judgment on appeal was simply precluded or diminished by a change in law, not forcibly transferred from a citizen to the government.  In fact, we did not locate a single case that addressed a taking in the context of the government's actual seizure and use of an accrued claim, outside the conduct of its foreign affairs.

In Section II, we show that the taking claim asserted here—the government's seizure and use of an accrued cause of action or judgment on appeal—is an issue of first impression in modern jurisprudence.   Historically, however, such a taking was thought to implicate the Fifth Amendment and require the remuneration of just compensation; a view supported by both James Madison, the author of the takings clause, and Chief Justice John Marshall.  The Court should not stray from that original understanding.

Finally, in Section III, we show that this case does not present a non-justiciable political question.   Specifically, the Court need not scrutinize the quality of the deal struck by the United States with Libya to resolve the claims asserted here.   The inquiry simply focuses on the amount of compensation the United States paid to each individual plaintiff for the confiscated property, not the merits of the Claims Settlement Agreement.

## FACTS

Mihai, a U.S. citizen, was killed by an act of state-sponsored terror—Libya's 1989 bombing of UTA Flight 772 in southeastern Niger.  *Cmpl*. ¶ 11.[1]  The Alimanestianu Plaintiffs are all U.S. citizens and close relatives of Mihai (spouse, siblings, and children).  *Id.* ¶ 10-16.  In 2002, the Alimanestianu Plaintiffs, together with the families of the other American victims of that terrorist act, filed an action against Libya and certain Libyan officers (collectively, the "Libyan Defendants") in the United States District Court in the District of Columbia—*Pugh et al. v. The Socialist People's Libyan Arab Jamahirya, et al., Civil Action No. 02-2026-HHK* (the "Pugh Action").  *Id.* ¶ 2-3, 20.

The complaint in the Pugh Action alleged that the Libyan Defendants downed UTA Flight 772 and asserted various state and federal common law and statutory claims against them.  *Id.* ¶ 21.  Libya appeared and defended itself.  On January 24, 2008, after years of litigation, the United States District Court for the District of Columbia granted summary judgment to the Pugh Action plaintiffs.  *Id.* ¶ 22.  The judgment was first entered on February 7, 2008, and re-entered on August 8, 2008 as final.  *Id.* ¶ 23.   The total damages awarded in the Pugh Action were

---

[1] References to the "Cmpl." refer to the complaint filed in this action.  References to "U.S. Br." refers to the defendant's motion to dismiss, dated November 13, 2014.  References to the "App." refers to the accompanying Appendix.

$6,903,683,445.00. *Id.* The damages specifically awarded to the Alimanestianu Plaintiffs were, in the aggregate, $1,297,336,632.00, broken down as follows:

    a. The Estate of Mihai was awarded $54,453,877 against Libya and $163,361,631 against the Libyan officers;

    b. Ioana Alimanestianu (wife of Mihai) was awarded $76,728,208 against Libya and $230,184,624 against the Libyan officers;

    c. Joanna Alimanestianu (daughter of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

    d. Nicholas Alimanestianu (son of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

    e. Irina Alimanestianu (daughter of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

    f. Alex Alimanestinu (son of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

    g. The Estate of Calin Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers;

    h. The Estate of Serban Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers; and

    i. The Estate of Constantin Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers.

*Id.* ¶ 23-24. The $1.3 billion award to the Alimanestianu Plaintiffs is referred to as the "Judgment."

### The Taking and the Claims Settlement Agreement

The Libyan Defendants immediately filed an appeal in the Pugh Action. *Id.* ¶ 29. Shortly thereafter, however, the United States took and compromised the Judgment. *Id.* ¶ 27. Specifically, on August 14, 2008, the United States entered into a "Claims Settlement Agreement" with Libya. *Id.*; *see also App.*, Ex. 1 (Claims Settlement Agreement).

The Claims Settlement Agreement states that it was entered by the United States and Libya "to further the process of normalization of relations on the basis of equality and mutual benefit." *App.*, Ex. 1 at A3. Article I explains that the agreement will result in "a final

4

settlement of the Parties' claims, and those of their nationals (including natural and juridical persons)," which included the Judgment held by the Alimanestianu Plaintiffs. *Id.*

Article II explains the basis for the compromise: "[t]he two Parties agree to authorize the establishment of a humanitarian settlement fund as the basis for settling the claims and terminating and precluding the suits specified in Article I." *Id.* at A4. An annex attached to the agreement provides more details. Specifically, a $1.8 billion humanitarian fund ("Fund") would be established and divided into two parts—$1.5 billion dollars for the United States (presumably to be distributed to the U.S. victims of Libyan terrorism) and $300 million dollars for Libya (presumably to be distributed to the Libyan victims of U.S. airstrikes). *Id.* at A6.

Finally, Article III(1)—the crux of the taking—provides that "[e]ach Party [defined as the United States and Libya] shall accept the resources for distribution ***as a full and final settlement of its claims and suits <u>and those of its nationals</u>*** as specified in Article I." *Id.* at A4 (emphasis added). The agreement further provided that, upon the receipt of that money, each nation would extend sovereign and diplomatic immunity to the other. *Id.* Consequently, the claims of the Alimanestianu Plaintiffs were espoused (taken) and compromised by the United States when it entered the Claims Settlement Agreement on August 14, 2008.

<u>**Historical and Legislative Background**</u>

In 2003, Libya abandoned its weapons of mass destruction and renounced terrorism. *See App.*, Ex. 2 at A18.[2] In 2006, formal diplomatic relations between the two countries were restored, but the legal and commercial relationship had yet to normalize. *Id.* at A19 ("Libyan officials expressed dissatisfaction with the pace and scope of normalization with the United

---

[2] A 2011 report authored by the Congressional Research Service for members of Congress summarizes the historical backdrop that led to the Claims Settlement Agreement and is included in the Appendix as Exhibit 2. The report can also be found online (http://fpc.state.gov/documents/organization/157348.pdf).

States and alleged that Libya had not gotten what was promised when it decided to abandon weapons of mass destruction and terrorism in 2003").  Of particular concern to Libya were a series of laws that had stripped state sponsors of terror, such as Libya, of their sovereign immunity and the related lawsuits pending in the United States, one of which was the Pugh Action.  *Id.* at A19-20 ("the enactment by Congress of changes in terrorism liability provisions and the awarding of significant monetary damages to the families and estates of U.S. victims of the 1989 bombing of UTA Flight 772 heightened the intensity of U.S.-Libyan engagement on outstanding terrorism claims").  The United States, for its part, wanted to show that Libya made "the right decision" in abandoning weapons of mass destruction and eschewing terrorism.  *Id.* at A20 ("the Bush Administration publicly underscored its desire 'to show the Libyans that they made the right decision' in abandoning weapons of mass destruction and eschewing terrorism"). It also wanted to ensure that U.S. companies would be able to participate in the Libyan economy.[3]

Congress responded to this state of affairs with the Libyan Claims Resolution Act (the "Act"), dated August 4, 2008.  The Act provided that Libya's sovereign immunity would be contingently restored, but only if the United States (1) entered into a "claims agreement" with Libya in which it compromised the terrorism-related claims of U.S. nationals against Libya and (2) the Secretary of State submitted a certification to the appropriate congressional committee that the United States has received sufficient funds to compensate the victims of Libya's state-sponsored terror.  *See App.*, Ex. 3 (the Act).  Libya's sovereign immunity was finally restored on

---

[3] The report provides that "[t]he Libyan government responded to congressional pressure with increasingly direct statements warning that if its relations with the U.S. government and U.S. business community remained complicated by outstanding terrorism claims, U.S. companies could miss opportunities to bid on lucrative Libyan government contracts to refurbish and expand the country's infrastructure. The Administration and the U.S. business community supported normalization with Libya . . ." *Id.* at A19.

or about October 31, 2008, when Secretary of State Condoleezza Rice submitted the required

certification to Congress—nearly two months after the Claims Settlement Agreement was

entered and the United States had compromised the Judgment.  *Cmpl.* ¶ 30; *App.*, Ex. 4

(certification).

## The United States Admission

The defendant's motion wrongly equates the alleged taking with the restoration of

Libya's sovereign immunity, and then contends that the alleged taking is simply a complaint

about a change in the law—the restoration of Libya's sovereign immunity—during the pendency

of an appeal.  *U.S. Br.* at 15.  But the government's characterization is counterfactual and

inconsistent with its own briefing to the United States Court of Appeals for the D.C. Circuit,

when it intervened in the Pugh Action and moved for dismissal.  There, the government admitted

that it had "espous[ed] the claims against Libya," which "made the plaintiffs' claims its own,"

and that it was "now the real party in interest:"

> The United States has espoused the terrorism-related claims of U.S. nationals
> against Libya, including plaintiffs' claims. The United States' espousal is
> pursuant to a claims settlement agreement with the Libyan government, reached
> as part of a restoration of diplomatic relations with Libya, and involving payment
> by Libya of a large sum for the benefit of U.S. nationals.  **In espousing the
> claims against Libya, the United States has made the plaintiffs' claims its
> own.**  Because the United States is now the real party in interest, the Court should
> permit it to intervene in this suit as plaintiff-appellee.  The Court should also
> vacate the district court's judgment and should dismiss this suit with prejudice.
> Vacatur of the judgment is necessary to ensure that the judgment has no future
> legal consequences that could cause the United States to breach its obligations to
> Libya under the claims settlement agreement.

*Cmpl.* ¶ 35; *App.*, Ex. 5 at A64 (appellate brief) (emphasis added); *see also Pugh v. Socialist*

*People's Libyan Arab Jamahiriya*, 2009 U.S. App. LEXIS 4142, at *4 (D.C. Cir. Feb. 27, 2009)

(vacatur necessary to ensure judgment has no legal consequence that could cause the United

States to breach its obligations to Libya under the Claims Settlement Agreement).  Thus, the

public record confirms that the taking occurred on August 14, 2008, before the change in law, when the United States compromised the claims of its nationals, not on October 31, 2008, when Libya's sovereign immunity was restored and U.S. jurisdiction removed.

The essential point here is that the restoration of Libya's sovereign immunity was of no consequence to the Alimanestianu Plaintiffs because as of August 14, 2008, the Alimanestianu Plaintiffs no longer held a judgment or claims against Libya.  Dismissal of the Pugh Action was required by the government's taking and settlement of those claims.

### A Public Good and Just Compensation

The public benefitted from the bargain struck in the Claims Settlement Agreement and associated taking.  The Claims Settlement Agreement itself explains that it was entered for a public benefit:  "to further the process of normalization of relations on the basis of equality and mutual benefit."  *App.*, Ex. 1 at A3.  Libya's borders were further opened to U.S. commerce and the United States was able to demonstrate to the world the tangible benefits of renouncing terrorism.

The United States gained that public good, however, by using the claims held by the victims of Libyan terror as a bargaining chip when it took and compromised those claims.  *See App.*, Ex. 6; *Cmpl.* ¶ 37.  Each of the Alimanestianu Plaintiffs had their judgment confiscated by the government and settled by the Claims Settlement Agreement.  The State Department later established the parameters for compensating those whose property was taken and compromised. The State Department first chose to pay the estates of those who died at the hands of Libyan terror, including the Estate of Mihai, $10 million.  *See App.*, Ex. 5.

The State Department then established seven additional categories of claimants who were entitled to compensation from the Fund.  The State Department recommended the amount

8

that should be awarded to each claimant who demonstrated that he or she met those threshold requirements. *See App.*, Ex. 6 (Jan. 15, 2009 letter). The category applicable to the Alimanestianu Plaintiffs (other than the Estate of Mihai) is Category B:

> Category B: This category shall consist of claims of U.S. nationals for mental pain and anguish who are living close relatives of a decedent whose death formed the basis of a death claim compensated by the Department of State provided that (1) the claim was set forth as a claim for emotional distress, solatium, or similar emotional injury by the claimant named in the Pending Litigation; (2) the claimant is not eligible for compensation from the associated wrongful death claim, and the claimant did not receive any compensation from the wrongful death claim; (3) the claimant has not received any compensation under any other part of the Claims Settlement Agreement, and does not qualify for any other category of compensation in this referral; and (4) the Pending Litigation against Libya has been dismissed before the claim is submitted to the Commission. We believe and recommend that a fixed amount of $200,000 would be an appropriate level of compensation for a claim that meets the applicable standards under Category B.

*Id.* at A86. The State Department referred administration of these claims to the Foreign Claims Settlement Commission of the United States (the "Commission"), which was tasked with (a) determining whether a putative claimant met the threshold requirements and (b) fixing the amount of compensation. *Id.* Four of the eight Alimanestianu Plaintiffs (not including the Estate of Mihai) did not meet the threshold requirements set out by the State Department for obtaining compensation. The Estates of Calin, Serban, and Constantine Alimanestianu were not entitled to compensation because they were not "living" at the time of the referral to the Commission. And Ioana Alimanestianu was not entitled to a payment because she was the beneficiary of the Estate of Mihai and thus "eligible for compensation from the associated wrongful death claim." *Id.* The Commission determined that Mihai's children met the threshold requirements of Category B and each was entitled to the recommended fixed compensation of $200,000.

The compensation paid by the United States for the confiscated property amounted to, at most, pennies on the dollar:

a.  The United States paid Ioana **nothing** in exchange for her judgment against the Libyan Defendants of **$306,912,832**;[4]

b.  The United States paid Joanna **$200,000** in exchange for her judgment against the Libyan Defendants of **$120,366,184**;

c.  The United States paid Nicholas **$200,000** in exchange for his judgment against the Libyan Defendants of **$120,366,184**;

d.  The United States paid Irina **$200,000** in exchange for her judgment against the Libyan Defendants of **$120,366,184**;

e.  The United States paid Alex **$200,000** in exchange for his judgment against the Libyan Defendants of **$120,366,184**;

f.  The United States paid The Estate of Mihai **$10 million** in exchange for its judgment against the Libyan Defendants of **$217,815,508**;

g.  The United States paid the Estate of Calin **nothing** in exchange for its judgment against the Libyan Defendants of **$97,047,852**;

h.  The United States paid the Estate of Serban **nothing** in exchange for its judgment against the Libyan Defendants of $**97,047,852**; and

i.  The United States paid the Estate of Constantin **nothing** in exchange for its judgment against the Libyan Defendants of **$97,047,852**.

Just compensation has not been paid.

## STANDARD OF REVIEW

To state a claim under the takings clause, a plaintiff must plausibly allege that it has a cognizable interest in property that was taken by the government.  *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009).  Dismissal is only appropriate if the pleadings fail to support "a plausible entitlement to relief."  That is, the "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-59 (2007).

---

[4] The Complaint incorrectly alleges that Ioana received compensation in the amount of $200,000.  *Cmpl.¶* 37(a).

**ARGUMENT**

I. **WHEN A JUDGMENT (OR CLAIM IN TORT) IS TAKEN BY THE GOVERNMENT AND THEN SETTLED, RESULTING IN A SUBSTANTIAL PAYMENT TO THE GOVERNMENT, A CLASSIC TAKING REQUIRING JUST COMPENSATION HAS OCCURRED**

    A. **Judgments on Appeal or Accrued Causes of Action Are Species of Property Protected by the Fifth Amendment and Cannot Be Seized by the Government Without Consequence**

The property interests at issue are judgments on appeal or, at the very least, tort claims for wrongful death and emotional distress. The United States used its power of eminent domain to seize the Judgment, along with the underlying entitlement to relief, resulting in a property transfer from the Alimanestianu Plaintiffs to the United States. The Judgment was compromised by the United States when it entered the Claims Settlement Agreement, which provided for a "full and final settlement of its claims and suits and those of its nationals."

    i. *A judgment on appeal or accrued cause of action is property within the meaning of the just compensation clause of the Fifth Amendment*

A cause of action (or judgment on appeal) is property within the meaning of the Fifth and Fourteenth Amendments. *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("a cause of action is a species of property protected by the Fourteenth Amendment"); *In re Aircrash in Bali, Indonesia on Apr. 22, 1974*, 684 F.2d 1301, 1312 (9th Cir. 1982) ("wrongful death claims are property within the meaning of the just compensation clause") (quotations omitted); *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("[b]ecause a legal cause of action is property [ ] within the meaning of the Fifth Amendment, claimants have properly alleged possession of a compensable property interest") (citations omitted); *Adams v. United States*, 391 F.3d 1212, 1225-26 (Fed. Cir. 2004) ("a cause of action may fall within the definition of property recognized under the Takings Clause").

Whether an accrued cause of action or judgment on appeal is a cognizable property interest sufficient to sustain a Fifth Amendment claim for just compensation depends on the nature of the government action.  The inquiry appears to turn on whether the government forcibly transferred ownership of the accrued cause of action to itself, as was done here, or whether the government simply abrogated or precluded that cause of action by a regulation or statute.  In the former case, property was transferred and thus taken, implicating the Fifth Amendment.  In the latter, property was simply affected by a new law; there was no actual transfer and thus no taking. (*See* detailed discussion in Sections (I)(A)(ii) and (II) below.)

The property here was appropriated and then used by the United States when it entered the Claims Settlement Agreement.  This appropriation is a classic confiscation of property that implicates the taking clause of the Fifth Amendment:  "nor shall private property be taken for public use, without just compensation."  *Id.* at 1218; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.").

> ii.  *The cases relied upon by the government merely establish that*
> *a property right is not implicated when the government passes*
> <u>*a law that precludes or diminishes an accrued claim*</u>

The government argues that a judgment on appeal or claim can never be property for purposes of the Fifth Amendment.  *U.S. Br.* at 6 ("settled law in this and other circuits excludes the form of 'private property' that plaintiffs allege was taken – the non-final judgment against Libya – from the kinds of property interests that are cognizable under the Takings Clause").  The contention is extraordinary.  The government claims an unfettered right to take and prosecute (or settle) the tort claims or judgments of any U.S. citizen because such claims and judgments have not *vested* and thus are not cognizable property protected by the Fifth Amendment.  *Id.* at 6-7.

The following three hypotheticals illustrate the danger of the government's limited view of the Fifth Amendment:

***Hypothetical 1***:  A factory pollutes a lake in a small Ohio town, killing the children who live in that town and swim in the lake.  The town parents band together and bring wrongful death claims against the factory.  The United States, sensing an opportunity to exert pressure on the factory without initiating a cumbersome environmental enforcement action, seizes and takes possession of the pending tort claims.  The United States presses the factory to settle and the factory agrees to cease polluting, clean up the lake, and pay the United States $15 million in full settlement of the wrongful death claims.  Under the government's proffered formulation of the takings clause, since the tort claims of the parents were not final non-appealable judgments, the government has no constitutional obligation to pay any compensation to the parents for the seized claims.

***Hypothetical 2***:  A class action was asserted against Amazon, Apple, and other purveyors of electronic books, asserting that the companies had colluded to fix the prices of e-books.  The plaintiffs prevailed and secured a $5 billion judgment, which was appealed by the defendants.  During the pendency of the appeal, the United States saw an opportunity to reduce the deficit, seized the judgment on appeal, and substituted itself for the plaintiffs.  Amazon and Apple proposed a settlement whereby they pay $4 billion dollars to the United States to compromise the claims.  The United States agreed and added the payout to the Treasury.   Under the government's formulation of the takings clause, no compensation to the class is required because the judgment was still on appeal.

***Hypothetical 3:***  Detroit is bankrupt.  Rather than have Detroit go through a lengthy and cumbersome bankruptcy proceeding, the United States simply seizes all accrued claims and

13

judgments on appeal against Detroit, thereby removing a substantial percentage of Detroit's obligations.  The seizure allows Detroit to avoid a Chapter 9 bankruptcy filing.  Under the government's formulation of the takings clause, it would not have to pay any compensation for the taken claims and judgments on appeal, because such claims and judgments had not vested.

Not surprisingly, the United States cannot cite a single case to support its contention that it may freely take possession of any judgment on appeal or accrued claim because such claims have not vested.  In none of the cases cited by the government were claims transferred from an individual to the government.  In each case, courts were confronted with either a due process or takings challenge to a new law or regulation affecting an underlying cause of action or lawsuit, either diminishing its value or precluding it altogether.  These cases only deal with the government's interference with a property interest, not the actual seizure.

For instance, in one line of cases, a federal statute immunized gun manufacturers from liability for injuries caused by their firearms in crimes, including already-accrued state causes of action, such as wrongful death.  Courts uniformly held that the statute did not constitute a taking of already-accrued state law claims of victims of gun violence.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009) (law immunizing manufacturers and sellers of firearms from civil liability for injuries inflicted by criminals, including already-accrued state law causes of action, does not implicate takings clause); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 180-82 (D.C. Ct. App. 2008), *cert. denied*, 556 U.S. 1104 (2009) (same).  The key distinction between the taking here and the alleged taking in *Ileto* is that, in *Ileto*, the government did not take possession of already accrued state law claims, settle them on whatever terms it deemed just, and retain the proceeds; the claims were merely precluded.

14

The other cases relied upon by the government are essentially identical to *Ileto*. At most, they stand for the principle that the takings clause is not implicated when a claim or judgment on appeal is abrogated, diminished, or precluded by a statute or regulation:

- *Rodgers v. Tristar Prods.*, 559 Fed. Appx. 1042, 1045 (Fed. Cir. 2012) (change to the federal false marking statute eliminating *qui tam* actions and providing that only individuals who suffered a competitive injury had standing to bring a claim did not constitute a taking, even in connection with lawsuit that was pending); *Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314, 1321 (D.C. Dir. 2014) (same);

- *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 2001) (adoption of federal statute of repose precluding claims against airplane manufacturers where accident occurred more than 18 years after the aircraft was manufactured did not constitute a taking of accrued claims that were precluded as a result);

- *Plyler v. Moore*, 100 F.3d 365, 374-75 (4th Cir. 1996) (termination of consent decree pursuant to the Prison Litigation Reform Act, which required termination of consent decrees to the extent they provided for relief beyond that which was necessary to correct the violation of a federal right, did not implicate property interest, as the inmates had no vested interest in the future enforcement of the decree);

- *Axel Johnson, Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 83-84 (2d Cir. 1993) (federal law amending statute of limitations for securities claims required reinstatement of dismissed causes of action, as time to appeal had not expired, and thus defendant had yet to acquire a vested right in the dismissal);

- *Central States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1345-47 (7th Cir. 1992) (no vested right in decision awarding interim payment, even if not appealed, since decision was inherently conditioned upon a final determination, which occurred after change in law that precluded basis for interim payment);

- *Tonya K. v. Bd. of Educ. of the City of Chicago*, 847 F.2d 1243, 1247-48 (7th Cir. 1988) (plaintiffs' counsel permitted to recover attorneys' fees due to change in law providing for such fees, even though consent decree had already been entered, because the parties never adjudicated the issue and the statute explicitly provided for such relief);

- *Hammond v. United States*, 786 F.2d 8, 12-15 (1st Cir. 1986) (law providing that a federal statutory remedy was the exclusive remedy for injuries arising out of atomic weapons testing was unlikely to be a taking of the now-precluded pending state law claims against government contractors);

- *Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1137-38 (11th Cir. 1983) (changes to Medicare reimbursement formula while lawsuit pending did not implicate a vested property right such that a taking had occurred);

- *Marks v. United States*, 15 Cl. Ct. 609, 612 (1988) (no property interest in undomesticated foreign judgment; executive order precluding domestication in any U.S. court and requiring submission to international arbitration panel for enforcement was not a taking);

- *Adams v. United States*, 391 F.3d 1212, 1225-27 (Fed. Cir. 2004) (amendment to Fair Labor Standards Act statute of limitations from six years to two years did not constitute a taking of already-accrued claims that became time-barred as a result); *Adams v. Hinchman*, 154 F.3d 420, 424 (D.C. Cir. 1998) (same);

- *In re TMI*, 89 F.3d 1106, 1113 (3d Cir. 1996) (law requiring application of different statute of limitations, rendering certain already-accrued claims time-barred, did not implicate a property right or offend due process);

- *Salmon v. Schwarz*, 948 F.2d 1131, 1143 (10th Cir. 1991) (law forcing persons injured by common law torts committed by federal employees within the scope of their employment to seek redress against the United States under the Federal Tort Claims Act, including individuals with already-accrued claims or judgments on appeal, did not implicate a vested property right for due process purposes); and *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir. 1990) (same).

These cases simply do not speak to whether the takings clause is implicated when a claim or judgment on appeal is actually transferred from an individual to the state. They all address laws that diminish or preclude already-accrued causes of action—functionally a regulatory taking, not an actual seizure—and quite sensibly conclude that the government need not pay compensation whenever a law impacts the viability or value of an accrued claim. In the words of Justice Holmes: "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922).

Here, however, the United States did not merely change a law which precluded the claims held by the Alimanestianu Plaintiffs against Libya (*i.e.*, the United States did not merely restore Libya's sovereign immunity, thus leaving the claims intact, but removed the jurisdiction of the

16

U.S. courts).  The Judgment was transferred from the Alimanestianu Plaintiffs and used as a

bargaining chip by the United States when it entered the Claims Settlement Agreement,

extinguishing both the Judgment and the underlying right to relief.  The government provided a

succinct explanation to the D.C. Circuit Court of Appeals:  "[i]n espousing the claims against

Libya, *the United States has made the plaintiffs' claims its own [and] is now the real party in*

*interest*" (emphasis added).  And President Bush confirmed that following the compromise, "no

United States national may assert or maintain any claim . . . in any forum, domestic or foreign."

*App.*, Ex. 7 at A93 (order).

Here, the United States received the proceeds of the Claims Settlement Agreement, which

included cash as a well as innumerable intangible benefits, such as the normalization of

diplomatic and legal relations with Libya as well as increased commercial opportunities for U.S.

companies.  Under any formulation, the actual cash proceeds received from the settlement of a

tort claim is surely a cognizable property interest.[5]

### B.   When the Government Uses Its Power of Eminent Domain to Forcibly Transfer Property from an Individual to the Government, a Classic Taking Has Occurred and Just Compensation Is Required; the Regulatory Takings Paradigm of *Penn Central* and Its Progeny Is Not Applicable

When the government uses its power of eminent domain to take possession of property

formerly held by a private party, a *per se* or "paradigmatic" taking has occurred and just

compensation is required.  *See, e.g., Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl.*

---

[5] The Federal Circuit in *Adams* suggested, in passing, that the preclusion or diminishment of a
cause of action is only cognizable under the takings clause if it concerns "a legally recognized
property interest."  391 F.3d at 1226.  *Adams*, notably, did not address the actual transfer of a
cause of action to the government.  Moreover, the formulation in *Adams* appears to duplicate the
Fifth Amendment's basic requirement that the plaintiff identify a "cognizable property interest"
and thus does not serve to distinguish cases where causes of action are deemed cognizable and
those where they are not.  *Id*.  But in any event, the proceeds from the settlement of the claims,
which includes cash, certainly qualify as a "legally recognized property interest."

*Prot.*, 560 U.S. 702, 713 (2010) ("the classic taking is a transfer of property to the State or to another private party by eminent domain"); *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (a "classic taking" occurs when "the government directly appropriates private property for its own use"). Because the property interest here, the Judgment, was appropriated by the United States from the Alimanestianu Plaintiffs, just compensation must be paid:

> A physical taking is the paradigmatic taking and occurs by a direct government appropriation or [a] physical invasion of private property. ***The jurisprudence pertaining to physical takings involves the straightforward application of* per se *rules*. The size and scope of a physical invasion is immaterial to the analysis; even if the government only appropriates a tiny slice of a person's holdings, a taking has occurred, and the owner must be provided just compensation.

*Casitas Mun. Water Dist. v. United States,* 543 F.3d 1276, 1288 (Fed. Cir. 2008) (emphasis added, citations and quotations omitted); *see also, Lingle*, 544 U.S. at 528 ("[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property").

Despite the forced transfer of the Judgment, the government posits that the Court should nevertheless look to the *Penn Central* factors to determine whether it must pay compensation for the seizure. *U.S. Br.* at 10; *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). The contention is puzzling. The *Penn Central* factors, applicable to regulatory takings, focus on determining when a regulation or statute so diminishes the value of the property at issue that a *de facto* taking has occurred. *See Lingle,* 544 U.S. at 538-39 (explaining that consideration of the *Penn Central* factors is designed to identify when a regulatory action is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain").

But the *Penn Central* paradigm is inapplicable here because the government actually seized the property in question—a "classic taking" rather than a regulatory taking. Prior to the

18

seizure, the Alimanestianu Plaintiffs held a judgment on appeal against the Libyan Defendants.

After the seizure the judgment belonged to the United States.  Where an actual transfer is made

from an individual to the government, the Supreme Court holds that the Fifth Amendment

mandates the payment of just compensation:

> The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation.  But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property.  Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of per se rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by "essentially ad hoc, factual inquiries, designed to allow" careful examination and weighing of all the relevant circumstances.
>
> ***When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.***

*Brown v. Legal Found. of Wash.,* 538 U.S. 216, 233-34 (2003) (citations omitted and emphasis

added); *see also Abrahim-Youri v. United States,* 139 F.3d 1462, 1466 (Fed. Cir. 1997)

(government's taking of claim does not fit in regulatory takings category).

Had the government merely restored Libya's sovereign immunity, or otherwise

diminished or interfered with the Judgment, the *Penn Central* factors might arguably apply.  But,

as the government took possession of the Judgment, the nuanced ad hoc analysis of *Penn Central*

is replaced by "a categorical duty to compensate."  Outside the realm of international relations,

however, we did not find a single case that addresses the takings clause in the context of the

seizure of a claim by the government, commonly referred to as espousal.

## II.   ESPOUSAL AND THE TAKINGS CLAUSE:  AN ISSUE OF FIRST IMPRESSION IN MODERN JURISPRUDENCE

Since the late 1800s, no U.S. court has squarely confronted the issue of whether the Fifth Amendment requires just compensation when the United States takes and compromises a claim held by a U.S. national against a foreign sovereign.  But, in a concurrence in the Supreme Court case *Dames & Moore v. Regan*, Justice Powell expressed his view that "the government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons."  453 U.S. 654, 691 (1981) (quotations omitted).

That is precisely what happened here; just compensation must be paid.

### A.  Historically, Courts Recognized That When the United States Takes and Then Compromises the Claims of Its Citizens Against Foreign Nations, the Fifth Amendment Requires The Remuneration of Just Compensation

The Claims Settlement Agreement is not the first international treaty or agreement to implicate the private claims of U.S. citizens against a foreign state.  There have been other instances where the United States has espoused and compromised the claims of its nationals against other nations in connection with its foreign affairs.  One of the earliest such instances occurred in the so-called French Spoliation cases, arising out of the state of quasi-war between the United States and France in the late 1790s.

During the quasi-war, French privateers seized American merchant vessels on the high seas.  In the context of negotiations to end that conflict, France demanded that the United States reaffirm several earlier treaties in which the United States granted France certain privileges.  The demand was unpalatable to the United States, as it would have brought the country into direct conflict with Great Britain.  The United States, for its part, demanded that France pay damages to the U.S. merchants for losses stemming from France's seizure of American merchant vessels.

20

The parties eventually agreed that the United States would renounce the claims of its citizens for damages against France, while France would drop its demand that the United States affirm its earlier treaties with France.  *See generally Gray v. United States*, 21 Ct. Cl. 340 (1886).

That agreement, however, left the aggrieved U.S. merchants without recourse against France; their only recourse was against the United States for an unconstitutional taking.  The majority of such claims languished for decades as no court had jurisdiction.  But in 1885 Congress conferred limited jurisdiction upon the Court of Claims to determine whether the renouncement constituted a taking and, if so, the amount owed by the United States.

The primary Court of Claims decision arising out of the 1885 act is *Gray*.  *Gray* held that the renouncement of the claims of U.S. nationals against France was unquestionably a taking that required the payment of just compensation:

> [T]he citizen whose property is thus sacrificed for the safety and welfare of his country has his claim against that country; he has a right to compensation, which exists even if no remedy in the courts or elsewhere be given him. A right often exists where there is no remedy, and a most frequent illustration of this is found in the relation of the subject to his sovereign, the citizen to his Government.
>
> It seems to us that this "bargain" (again using Madison's word), by which the present peace and quiet of the United States, as well as their future prosperity and greatness were largely secured, and which was brought about by the sacrifice of the interests of individual citizens, falls within the intent and meaning of the Constitution, which prohibits the taking of private property for public use without just compensation.  We do not say that for all purposes these claims were "property" in the ordinarily accepted and in the legal sense of the word; but they were rights which had value, a value inchoate, to be sure, and entirely dependent upon adoption and enforcement by the Government; but an actual money value capable of ascertainment . . .

*Id.* at 392-93.

The timing of the putative taking in *Gray,* and the importance of the underlying treaty with France to the young Republic, gave the court the benefit of the views of two of the most

influential legal minds of the founding generation:  James Madison, the drafter of the takings clause, and Chief Justice John Marshall.  Both Marshall and Madison supported the view that the Fifth Amendment required the United States to pay just compensation when it bargained away the individual claims of its citizens against France.  *Id.* at 390.

*Gray* also relied upon the writings of the highly influential legal scholar Emer de Vattel.[6] Vattel wrote in his seminal treatise The Law of Nations that "the necessity of making peace authorizes the sovereign to dispose of the property of individuals and the eminent domain power gives him a right to do it . . . but as it is for the public advantage that he thus disposes of them, the state is bound to indemnify the citizens who are sufferers by the transaction."  Book IV, Ch. 2, § 12; *see also Gray*, 21 Ct. Cl. at 391.

*Gray*'s holding tracks the intent of the founding generation:  the takings clause requires the payment of just compensation when the United States takes and compromises the claims of its citizens as part of an international agreement.

### B.  Modern Takings Jurisprudence Has Not Upset the Central Holding in *Gray v. United States*, 21 Ct. Cl. 340 (1886):  The Takings Clause Requires the Government to Pay Just Compensation When It Takes and Compromises a Claim by International Agreement.

#### i.   *The Supreme Court has implicitly endorsed the holding of Gray*

Nothing has changed in the last 135 years that would upset *Gray*'s holding.  And though the Supreme Court has never taken up the issue directly, it has peripherally addressed the issue in

---

[6] Vattel's The Law of Nations has been described as "unrivaled" and "authoritative" in its influence on the founding generation.  *See, e.g.,* Paul Finkelman, Foreign Law and American Constitutional Interpretation: A Long and Venerable Tradition, 63 N.Y.U. Ann. Surv. Am. L. 29, 45 (2007); Robert J. Reinstein, Executive Power and The Law Of Nations in the Washington Administration, 46 U. RICH. L. REV. 373, 404 (2012); Peter Onuf & Nicholas Onuf, Federal Union, Modern World: The Law of Nations in an Age of Revolutions 1776-1814, at 11 (1993) (discussing influence of international writers and stating that Vattel's work "was unrivaled... in its influence on the American founders").  Vattel's work has also been cited in nearly 200 cases by the Supreme Court, most recently by Chief Justice Roberts in 2014.

two cases arising out of the Algiers Accords, an international agreement that suspended all claims pending between U.S. nationals and Iran and provided that those claims would all be resolved by international arbitration.[7]  In *Dames & Moore*, Justice Rehnquist, speaking for the majority, expressed no view on whether the suspension of the claim constituted a taking, but provided that such a claim should be raised and considered by the Court of Claims under the Tucker Act.  453 U.S. at 688-90.

Justice Powell concurred but added his view, which echoed the holding of *Gray,* that "[t]he government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons."  *Id.* at 691; *see also Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.,* 651 F.2d 800, 814 (1st Cir. 1981) ("[t]here may well be situations when the President's extinction or 'settlement' of a claim against a foreign government, without the consent of the claimant, would constitute a 'taking' of private property for a public 'use'").

Nearly a decade after *Dames & Moore*, *Gray* was cited with approval in *United States v. Sperry Corp.*, 493 U.S. 52, 59 n.6 (1989).  Justice White, writing for a unanimous court, cited and distinguished *Gray* by explaining that "Sperry's ability to pursue its claim against Iran in

---

[7] The 1981 Algiers Accords (the "Accords") resolved the Iranian hostage crisis, freeing 52 United States nationals.  As part of the Accords, the United States and Iran agreed that an international arbitral tribunal would resolve the claims of all U.S. nationals against Iran and that all claims pending in the United States courts would be suspended.  The agreement provided that the United States and Iran would promote the settlement of the claims by the parties directly concerned, but if settlement could not be reached within six months, the claims would be submitted to an international tribunal.  To fulfil U.S. obligations under the Accords, President Ronald Reagan suspended, by executive order, all pending lawsuits against Iran in the United States.  President Reagan further provided that each lawsuit would be either terminated, if the arbitral tribunal reached the merits of the underlying dispute, or reinstated, if the arbitral tribunal determined that it did not have jurisdiction.  A key distinction with the Claims Settlement Agreement here is that the Accords did not settle the claims between U.S. nationals and Iran; it merely provided an alternative forum for resolving the claims.

another forum distinguishes this case from [*Gray*].  In the treaty at issue in *Gray*, the United

States canceled American claims against France altogether."  *Id*. Our case, unlike *Sperry*, is

analogous to *Gray*—the Judgment was canceled and the plaintiffs were not entitled to bring their

claims in another forum (*see* below at Section (II)(B)(iii)).

> ### ii.   The limited Federal Circuit precedent on espousal rests on
> ### principles of law that are inapplicable here

Though two relatively recent Federal Circuit cases have touched upon the takings clause

in the context of espousal, they rest on two inapplicable principles of law:

**First**, the takings clause is not implicated where the espousal occurs in the context of an

agreement made primarily for the benefit of the individual whose claim was espoused.  *See, e.g.*

*Belk v. United States*, 858 F.2d 706, 709 (Fed. Cir. 1988) (government's espousal and settlement

of claims of U.S. hostages against Iran arising out of their seizure and detention in exchange for

their freedom was not a taking because "[t]he President's action in implementing the Algiers

Accords was primarily designed to benefit the hostages. . . .[and where] the private party is the

particular intended beneficiary of the governmental activity, 'fairness and justice' do not require

that losses which may result from that activity 'be borne by the public as a whole'").  Here, the

Claims Settlement Agreement was not entered primarily to benefit the Alimanestianu Plaintiffs,

but rather for the public good.  The opening sentence of the Claims Settlement Agreement

confirms that its primary purpose is "to further the process of normalization of relations on the

basis of equality and mutual benefit."  *App.*, Ex. 1.  And four of the Alimanestianu Plaintiffs

received absolutely no compensation for the taking.

**Second**, there is no unconstitutional taking where the compensation paid for the espoused

claim is "just" in light of the circumstances.  *Abrahim-Youri* illustrates this principle.  Like

*Dames & Moore* and *Belk*, *Abrahim-Youri* arises out of the Algiers Accords.  In 1990 the United

States and Iran reached an agreement resolving the small claims (those less than $250,000) still pending before the international arbitration panel.[8] 139 F.3d at 1463-64.  The United States espoused the small claims, settled them for $55 million, and referred those claims to a commission for an adjudication of the claimants' right to recovery.

All of the plaintiffs in *Abrahim-Youri* prevailed before the commission and received 100% of the principal awarded.  But because there were insufficient funds to cover 100% of the interest awarded, they claimed that there had been a taking.  The Federal Circuit disagreed, holding that there was no taking because the result of the referral to the commission, which resulted in the award of 100% of the principal and 33% of the interest, was just given the circumstances:  "[h]ere, though the choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected."[9]  *Id.* at 1468; *see also Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 245-46 n.15-16 (Ct. Cl. 1983) (compromise of claim for 13.89% of value was reasonable given the impossibility of securing any compensation from China in the absence of international settlement).

*Abrahim-Youri* confirms the basic constitutional principle that just compensation must be provided when the claims of U.S. nationals are espoused and settled.  And here, unlike *Abrahim-Youri*, the compensation paid to the Alimanestianu plaintiffs was unreasonable; *i.e.*, not "just."  As compensation for the espoused judgments, the United States elected to pay nothing to four of

---

[8] As of August 1989, only 82 out of over 2,200 small claims had been adjudicated by the arbitration panel.  *Abrahim-Youri*, 139 F.3d at 1464.

[9] The court also found that the agreement with Iran was entered by the government primarily to benefit the plaintiffs, resolving "what had become a problem for the small claimants"—the extremely slow pace of the arbitration panel—and "not to harm them or to gain a government benefit at their expense."  *Id.* at 1467 (citing *Belk*).

the Alimanestianu plaintiffs, $200,000 to four of the plaintiffs, and $10 million to the estate.  The

taken final judgments (or at the very least claims adjudicated and valued by a federal court)

ranged in size from $97 million to $300 million.  This is plainly not analogous to *Abrahim-Youri*,

where the aggrieved had been fully compensated for its principal award, but only partially

compensated for the interest it would have been entitled in the absence of a taking.  Whether the

Alimanestianu Plaintiffs received just compensation for their taken property is, at the very least,

an issue of fact.

### iii. *The government has not provided an alternative forum*

Several cases suggest that a claim is not taken when the government simply substitutes

one forum for another.  In the context of espousal, this might occur if the government refers

claims to a commission or arbitration panel for adjudication on the merits.  *See, e.g., Dames &

Moore*, 453 U.S. at 690 (Stevens, J, concurring) ("possibility that requiring this petitioner to

prosecute its claim in another forum will constitute an unconstitutional 'taking' is . . . remote");

*Chas. T. Main Int'l*, 651 F.2d at 814-15 (forced submission of claims against Iran for arbitration

would "constitute a 'taking' of property only if the alternative method of  satisfying the claim

[*i.e.*, submission to the Tribunal] is demonstrably and measurably inferior to the rights otherwise

available"); *Marks*, 15 Cl. Ct. at 612 (agreement prohibiting adjudication of claim against Iran

"in any forum other than the Tribunal does not amount to a taking [because] [p]laintiffs had an

alternative forum, and an opportunity for a remedy").

The referral at issue in *Abrahim-Youri* ("for final evaluation and determination of

amount") is another example of a referral that substituted one forum (international arbitration)

for another (the commission).  139 F.3d at 1464.  In that case, the commission was tasked with

adjudicating the merits of the underlying claims between the small claimants and Iran:

> The Commission concluded its adjudication of the small claims by February 1995. The proceedings held before the Commission were ex parte; Iran was not a party to the proceedings, but did provide numerous documents to the Commission. A total of 3,066 claims were resolved, and 1,000 of the claims were upheld. The successful claimants received awards plus interest, measured from the date of Iran's wrongful act until June 22, 1990, the effective date of the Settlement Agreement.

*Id.*

The proceedings before the Commission here, however, did not in any way approximate an alternative forum. The Commission appeared to function in a purely administrative capacity: to determine whether a claimant met basic threshold requirements for entitlement to compensation established by the State Department (*e.g.*, U.S. citizen, close relative of victim, alive at time of referral, pending claim against Libya in U.S. Court that had been withdrawn). And the actual amounts awarded were established neither by the Commission nor by the merits of the underlying claims against Libya; they were predetermined by the State Department.

As noted above, four of Alimanestianu Plaintiffs did not meet the threshold requirements established by the State Department and thus were provided no forum and no compensation. The other four received the recommended payment of $200,000; there was no true independent adjudication or valuation of the claims by the Commission. This is plainly not a case where one forum was simply substituted for another.

*       *       *

*Gray* remains the most recent case to reach the merits of a true per se taking in the context of espousal. *Gray* held that the takings clause requires the government to pay just compensation when it takes and compromises the claims of a U.S. citizen for use in international negotiations. *Gray*'s interpretation of the takings clause finds support from the author of the takings clause, James Madison, as well as Justice John Marshall. *See also Dames & Moore*, 453

U.S. at 691 ("the government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons") (Powell, J, concurring).  This Court should not stray from that original understanding.

### III.   THIS CASE DOES NOT PRESENT A NON-JUSTICIABLE POLITICAL QUESTION

#### A.   The Merits of the Claims Settlement Agreement Is Not at Issue

The United States suggests that the claims here cannot even be considered by the Court because they "would involve inquiry into the heart of the President's conduct of foreign relations in resolving disputes with Libya through the Claims Settlement Agreement."  *U.S. Br.* at 19. Hardly.  Neither the merits of the Claims Settlement Agreement with Libya, nor the authority of the President to enter into the Claims Settlement Agreement and espouse claims against Libya is questioned.  Assuming, *arguendo*, that there has been a taking, the only remaining issue is whether the compensation paid by the State Department for the seized property—nothing to four of the plaintiffs, $200,000 to four of the plaintiffs, and $10 million to the estate—was just.

The crucial issue is how much the United States paid to the Alimanestianu Plaintiffs for taking their claims (*i.e.*, whether compensation was just), not how much the United States got from Libya (be it a single dollar or billions).  The United States could have compromised the claims against Libya for nothing, yet paid the full amount of the Judgment to the Alimanestianu Plaintiffs.  Or alternatively, the United States might have received billions of dollars from Libya, but paid the Alimanestianu Plaintiffs nothing.  Thus, the amount received by the United States is immaterial to the analysis; the Fifth Amendment requires the Court to determine whether the compensation paid by the government to the Alimanestianu Plaintiffs was just, not to scrutinize the Claims Settlement Agreement with Libya and the benefit received by the public.

**B.  Reaching the Merits of the Taking Claim Does Not Encroach upon a Non-Justiciable Political Question**

> i.  *The Supreme Court has already held that the political question doctrine does not preclude consideration of the kind of taking alleged here*

The government posits that a taking which arises out of an international agreement cannot be adjudicated because resolution "would undermine the President's ability to conduct foreign relations." *US. Br.* at 19.  That notion was rejected by the Supreme Court.  In *Dames & Moore*, the Supreme Court did not see any obstacle to the adjudication of a taking claim arising out of such an agreement:  "to the extent petitioner believes it has suffered an unconstitutional taking by the suspension of the claims, we see no jurisdictional obstacle to an appropriate action in the United States Court of Claims under the Tucker Act."  453 U.S. at 689-90.

The Supreme Court confirmed that position in *Sperry Corp*.  There, the Supreme Court considered whether the imposition of a 1.5% administrative fee on amounts awarded to litigants who prevailed in arbitration against Iran pursuant to the Algiers Accords was a taking.  The Court specifically considered whether the imposition of the fee was just in light of the benefits conferred by the Accords to the complaining claimants:  "[t]he Tribunal made available to claimants such as Sperry sufficient benefits to justify the imposition of a reasonable user fee." 493 U.S. at 63-64.  In light of *Dames & Moore* and *Sperry Corp.*, abstention would surely be improper.

> ii.  *Precedent relied on by the government is no longer good law*

A non-justiciable political question only exists if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."  *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993); *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  And determining whether just compensation has been paid for seized

property is a core judicial function that should not be avoided on political question grounds. *See,*
*e.g., Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006) ("claims based on the most
fundamental liberty and property rights of this country's citizenry, such as the Takings and Due
Process Clauses of the Fifth Amendment, are justiciable, even if they implicate foreign policy
decisions") (quotations omitted); *Langenegger v. United States*, 756 F.2d 1565, 1568-69 (Fed.
Cir. 1985) (adjudication of a "taking claim[] is clearly the role of the judiciary according to the
Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function");
*see also Zivotofsky*, 132 S. Ct. at 1427-28 (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803))
(issues of constitutionality, in particular, are matters for the judiciary to decide).

Against this authority the United States relies heavily upon a 1983 Court of Claims
decision—*Shanghai Power Co.*—that is both easily distinguished and has been implicitly
overturned by the Federal Circuit. *Shanghai* held that the political question doctrine precluded
"judicial inquiry into whether the President could have extracted a more generous settlement
from another country." 4 Cl. Ct. at 248. As noted above, however, resolution of the asserted
takings claim would not necessitate such an inquiry. Moreover, *Shanghai Power* was implicitly
overturned by the Federal Circuit in *Abrahim-Youri* and *Langenegger*, 756 F.2d at 1568-70
(taking claim arising out of Executive branch involvement in action taken by the El Salvador
government was justiciable because it only involved "a determination of the lawfulness of the
executive's deprivation of appellants' private property without just compensation," not inquiry
into the "ulterior motives" of the two governments for the taking).

In *Langenegger*, the Federal Circuit explained that "the Constitution does not provide for
a foreign affairs exception," and noted that courts are routinely confronted with "questions which
consider congressional or executive actions and purposes, and have managed to decide cases

30

without putting the government in a fishbowl." 756 F.2d at 1569. Like *Langenegger*, the present case requires "no second-guessing of the executive branch," and seeks "only a determination of the lawfulness of the executive's deprivation of [the plaintiffs'] privative property without just compensation." *Id.* at 1570. Therefore, like *Langenegger,* "it is justiciable." *Id.*; *accord Bancoult v. McNamara,* 445 F.3d at 435; *see Dames & Moore*, 453 U.S. at 689-90; *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988).

And in *Abrahim-Youri*, the Federal Circuit actually reached the merits of an espousal-related taking, finding that the compensation was just given the circumstances. The Federal Circuit did not abstain on political question grounds.[10]

*       *       *

The government's suggestion that the political question doctrine renders the plaintiffs' claims non-justiciable must be rejected in light of *Dames & Moore*, *Sperry Corp.*, *Langenegger* and *Abrahim-Youri*.

---

[10] The United States also cites to *Belk*. But *Belk*'s holding is quite limited as the plaintiffs there challenged the merits of the Accords. In *Belk*, the Federal Circuit noted that the political question doctrine precluded consideration of the issue:

> The appellants apparently contend that the President should not have entered into the Algiers Accords because he could have obtained better terms . . . [but] [t]hat determination was "of a kind clearly for nonjudicial discretion," and there are no "judicially discoverable and manageable standards" for reviewing such a Presidential decision. A judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations.

858 F.2d at 710. But *Belk*'s holding is undermined by the court's resolution of the very issue it claimed was non-justiciable (see above). And in any event, political question or not, *Belk* is inapposite as the issue of whether the President could have struck a better deal with Libya is plainly not before the Court.

## CONCLUSION

For the reasons stated herein, the government's motion to dismiss should be denied.

Dated: New York, New York
January 22, 2015

Respectfully submitted,

BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI  LLP


By:            /s Zeb Landsman
_____
      Zeb Landsman, Esq. (Attorney of Record)
      Richard N. Chassin, Esq.
      Jesse T. Conan, Esq.
299 Park Avenue
New York, New York 10171
zlandsman@beckerglynn.com
rchassin@beckerglynn.com
jconan@beckerglynn.com
Tel:  (212) 888-3033
Fax:  (212) 888-0255

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify under penalty of perjury that on this 22nd day of January 2015, a copy of the foregoing "**PLAINTIFFS' OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS"** was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s Zeb Landsman</u>