# In the United States Court of Federal Claims

No. 14-704C

(Filed: October 29, 2015)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **ALEXANDER ALIMANESTIANU, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Rule 8(a)(2); Rule 12(b)(6); Motion to Dismiss; Fifth Amendment Taking; Property Interest; Nonfinal Judgment; Justiciability; Political Question. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Michael Zeb Landsman, Richard N. Chassin, and Jesse T. Conan, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Floor, New York, NY 10171, for Plaintiff.

Benjamin C. Mizer, Robert E. Kirschman, Jr., Reginald T. Blades, Jr., and L. Misha Preheim, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

**WILLIAMS**, Judge.

This Fifth Amendment taking case comes before the Court on Defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs, family members of an American citizen killed in an airplane explosion caused by Libyan-sponsored terrorism, obtained a favorable judgment on wrongful death claims in the United States District Court for the District of Columbia. Subsequently, in an international claims settlement agreement that normalized relations between the United States and Libya and restored sovereign immunity to Libya, the United States espoused Plaintiffs' claims against Libya and compromised them for far less than Plaintiffs' judgment. Now, Plaintiffs seek compensation under the Fifth Amendment for the Government's alleged taking of Plaintiffs' claims and judgment against Libya.

Defendant argues that Plaintiffs' Fifth Amendment taking claims should be dismissed for three reasons: (1) Plaintiffs' claims are not based upon a valid property interest; (2) restoration of jurisdictional immunity is not a taking; and (3) Plaintiffs' claims constitute nonjusticiable political questions. Because this Court finds that Plaintiffs have alleged a Fifth Amendment taking, Defendant's motion to dismiss is **DENIED**.

**Background**[1]

Plaintiffs are family members of Mihai Alimanestianu, a United States national who was killed on September 19, 1989, when Union de Transports Aeriens Flight 772 exploded over Niger due to an act of terror sponsored by the Libyan Government. In 1996, Congress amended the Foreign Sovereign Immunities Act to strip Libya of sovereign immunity with respect to claims for money damages for personal injury or death caused by acts of state-sponsored terrorism. 28 U.S.C. § 1605(a)(7) (1996).

In 2002, Plaintiffs filed a lawsuit stemming from Mr. Alimanestianu's death against Libya and six high-ranking Libyan officials[2] in the United States District Court for the District of Columbia, Pugh, et al. v. Socialist People's Libyan Arab Jamahiriya, Civil Action No. 02-2026-HHK (D.D.C.). The Court granted summary judgment in Plaintiffs' favor on January 24, 2008, and on August 8, 2008, entered final judgment, awarding Plaintiffs approximately $1.3 billion.[3] The District Court distributed the award among Plaintiffs as follows:

- Estate of Mihai Alimanestianu:  $54,453,877 against Libya, $163,361,631 against the Libyan officials;
- Ioana Alimanestianu (wife of Mihai Alimanestianu):  $76,728,208 against Libya, $230,184,624 against the Libyan officials;
- Joanna Alimanestianu (daughter of Mihai Alimanestianu):  $30,091,546 against Libya, $90,274,638 against the Libyan officials;
- Nicholas Alimanestianu (son of Mihai Alimanestianu):  $30,091,546 against Libya, $90,274,638 against the Libyan officials;
- Irina Alimanestianu (daughter of Mihai Alimanestianu):  $30,091,546 against Libya, $90,274,638 against the Libyan officials;
- Alex Alimanestianu (son of Mihai Alimanestianu):  $30,091,546 against Libya, $90,274,638 against the Libyan officials;
- Estate of Calin Alimanestianu (brother of Mihai Alimanestianu):  $24,261,963 against Libya, $72,785,889 against the Libyan officials;
- Estate of Serban Alimanestianu (brother of Mihai Alimanestianu):  $24,261,963 against Libya, $72,785,889 against the Libyan officials; and
- Estate of Constantin Alimanestianu (brother of Mihai Alimanestianu):  $24,261,963 against Libya, $72,785,889 against the Libyan officials.

---

[1] This background is derived from Plaintiffs' Complaint and the appendices and exhibits to the parties' motion papers.

[2] The six Libyan officials sued in their individual capacities were Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli.

[3] Plaintiffs were joined in the Pugh action by similarly situated parties. The total award to all Pugh plaintiffs was $6,903,683,445.

Compl. ¶ 24.

The defendants in the Pugh action filed a notice of appeal on August 14, 2008. Pugh v. Socialist People's Libyan Arab Jamahiriya, Nos. 08-5387, 08-5388 (D.C. Cir.) (consolidated).

On the same day that the Pugh defendants appealed, the United States entered into a "Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya," ("the Agreement"). Pls.' Resp. Ex. 1, at A3-A5. As a result of the Agreement, Libya was no longer subject to the exceptions to immunity from jurisdiction for terrorism-related wrongful death and physical injury claims. The Agreement "terminate[d] permanently all pending suits (including suits with judgments that are still subject to appeal or other forms of direct judicial review)," and precluded any future suits arising out of Libyan-sponsored terrorism. Id. at A3.

As part of the Agreement, the United States and Libya established a "humanitarian settlement fund." Id. at A4, A6. The United States deposited $300 million into the fund, which was used to compensate Libyan victims of U.S. airstrikes. Libya deposited $1.5 billion into the fund, which was used to compensate all United States claimants. The United States and Libya each agreed to accept these funds "as a full and final settlement of its claims and suits and those of its nationals," and each party was required to, among other things, "[s]ecure . . . the termination of any suits pending in its courts . . . (including proceedings to secure and enforce court judgments), and preclude any new suits in its courts," and restore "sovereign, diplomatic and official immunity to the other Party." Id. at A4.

In 2008, Congress enacted the Libyan Claims Resolution Act. Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA"). The LCRA codified the Agreement and provided that, upon certification that the United States received the funds pursuant to the Claims Settlement Agreement, sovereign immunity would be restored to Libya. Id.

Secretary of State Condoleezza Rice issued the certification that the United States had received the Libyan funds, as required by the LCRA, on October 31, 2008. The same day, President Bush issued Executive Order No. 13,477, providing that any pending suit by United States nationals, and any pending suit within the United States by foreign nationals—"including any suit with a judgment that is still subject to appeal"—that came within the terms of the Claims Settlement Agreement "shall be terminated." Pls.' Resp. Ex. 7, at A93; 73 Fed. Reg. 65,965, 65,965-66 (Oct. 31, 2008).

Meanwhile, the appeal in Pugh was proceeding in the D.C. Circuit. The two appeals had been consolidated, but briefing had not yet begun. On January 9, 2009, the United States filed a motion to "intervene, vacate judgment, and dismiss suit with prejudice," arguing that, pursuant to the LCRA, the Claims Settlement Agreement, and Executive Order No. 13,477, "U.S. Courts no longer have jurisdiction over terrorism-related claims against Libya." Pls.' Resp. Ex. 5, at A63, A64. In its motion, the Government stated that it "espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims . . . . In espousing the claims against Libya, the United States has made the plaintiffs' claims its own." Id. at A64. The Government argued:

>As a result of the President's espousal of U.S. nationals' terrorism-related claims against Libya and the immunity provisions of the Libya Claims Resolution Act, claims against Libya such as those at issue in this case are no longer justiciable. U.S. nationals with claims covered by the Claims Settlement Agreement must instead seek compensation from the United States through administrative proceedings established by the Secretary of State for any terrorism-related injuries caused by Libya.

Id. at A72-A73.

On February 27, 2009, the D.C. Circuit granted the Government's motion, vacated the judgment in Pugh and directed the District Court to dismiss the case with prejudice in light of the Libyan Claims Resolution Act, the Claims Settlement Agreement, and "the President's espousal in Executive Order 13477 of the terrorism-related claims of U.S. nationals against Libya." Pugh, Nos. 08-5387, 08-5388, 2009 U.S. App. LEXIS 4142 *3-4 (D.C. Cir. Feb. 27, 2009). On March 6, 2009, the District Court dismissed the Pugh action with prejudice.

Following the receipt of $1.5 billion from Libya in October 2008, the State Department established a fund to compensate individuals with wrongful death or personal injury claims against Libya caused by acts of state-sponsored terrorism. The State Department determined that a $10 million payment per death would be "fair compensation" for wrongful death claims. See Pls.' Resp. Ex. 5, at A72. The children of Mihai Alimanestianu received $200,000 each from the Foreign Claims Settlement Commission of the United States, and the Estate of Mihai Alimanestianu received $10 million. Mihai Alimanestianu's wife and the estates of his brothers received no compensation.

## Discussion

Plaintiffs assert that, in entering into the Claims Settlement Agreement, the United States Government effected a Fifth Amendment taking by compromising their claims without their authorization, taking their billion-dollar judgment and awarding them, "at most, pennies on the dollar." Compl. ¶¶ 33, 37; Pls.' Resp. 4-5, 9. Defendant moves to dismiss this action for failure to state a claim upon which relief can be granted, arguing: (1) Plaintiffs do not possess a valid property interest upon which to base their takings claim; (2) assuming, arguendo, that Plaintiffs allege a cognizable property interest, restoration of jurisdictional immunity to Libya cannot be considered a "taking" of that interest; and (3) Plaintiffs' claims constitute nonjusticiable political questions.

**Legal Standard**

Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

4

for the misconduct alleged." Iqbal, 556 U.S. at 678. This plausibility standard requires more than a "sheer possibility" that the defendant has violated the law. Id.

**Whether Plaintiffs Possess a Valid Property Interest**

Plaintiffs allege that the property interest taken is their $1,297,336,632 judgment awarded by the District Court in the Pugh action, and Defendant counters that a nonfinal judgment or a cause of action does not constitute a cognizable property interest.

The Fifth Amendment of the United States Constitution provides: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. Thus, "[t]he Fifth Amendment's Takings Clause prevents the Legislature (and other Government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" Landgraf v. USI Film Prods., 511 U.S. 244, 266 (1994) (quoting United States v. Brown, 381 U.S. 437, 456-62 (1965)). The Takings Clause "was designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

The Federal Circuit established a two-part test to determine whether a governmental action constitutes a taking under the Fifth Amendment: "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009). "It is essential in advancing a taking claim that a plaintiff establish that he is the owner of a compensable interest in property." Payne v. United States, 31 Fed. Cl. 709, 710 (1994) (citing Armstrong, 364 U.S. at 44-46). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" Phillips v. Wash. Legal Found., 524 U.S. 156, 164, (1998) (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). Federal law and common law can also define such property rights. Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992).

The Court must determine whether Plaintiffs' judgment stemming from "various state and federal common law and statutory claims" [4] related to the death of Mr. Alimanestianu constituted a cognizable property interest. See Compl. ¶ 21. Defendant argues that the judgment awarded to Plaintiffs is not a cognizable property interest because it is nonfinal, i.e., the judgment had not vested and was still "subject to appeal or other available relief within the judicial system." Def.'s Mot. 6. Defendant contends that no "vested" right could attach "until there is a final, unreviewable judgment." Id.

---

[4] The plaintiffs in the Pugh action sought "money damages for extrajudicial killings, aircraft sabotage, and personal injuries." Order granting in part and denying in part Motion to Dismiss, Pugh, No. 02-2026-TPJ (D.D.C. Oct. 28, 2003). Jurisdiction was predicated upon the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611 (2003). Id.

Although at the time of the alleged taking, Plaintiffs' judgment was nonfinal and subject to appeal, Defendant's conduct prevented Plaintiffs' judgment from becoming final. Defendant intervened in the appeal and moved the Court to vacate the judgment and dismiss the action, based on the Settlement Agreement and the LCRA. Defendant's action in securing a vacatur of the judgment based upon nonjudicial conduct of the Executive and Legislature cut off the established judicial appellate process and rendered the trial court's judgment a nullity. This vacatur of a final trial court judgment via an international settlement agreement, while presumed to be legal, is a deprivation of the rights of litigants who had invested time and energy in the established legal process and had been awarded a monetary judgment. As the Supreme Court has recognized:

> To allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would – quite apart from any considerations of fairness to the parties – disturb the orderly operation of the federal judicial system.

U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 27 (1994).

Because what was taken was Plaintiffs' right to complete the appellate process to attain a final judgment, the lack of finality of Plaintiffs' judgment cannot form a basis for denying a taking. Rather, Defendant deprived Plaintiffs of their right to defend their judgment to finality, and this deprivation was part and parcel of the taking. Defendant took Plaintiffs' claims that they had pursued to a final trial court judgment, compromised those claims without Plaintiffs' consent, and deprived Plaintiffs of their right to pursue their claims on appeal. In effecting its espousal of Plaintiffs' claims, the Government took the claims, the judgment, and Plaintiffs' ability to obtain relief through the judicial system.

Defendant contends that causes of action in general do not constitute cognizable property interests. Defendant further argues that Plaintiffs' nonfinal judgment is not a cognizable property interest because it was inchoate in that Plaintiffs' cause of action did not provide a certain expectation of compensation. However, the Federal Circuit has recognized that a cause of action may be a cognizable property interest. See Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("Because a legal cause of action is a property interest within the meaning of the Fifth Amendment, claimants have properly alleged possession of a compensable property interest.") (internal citations omitted). See also Aviation & Gen. Ins. Co. et al. v. United States, 121 Fed. Cl. 357, 365 (2015) (finding that insurers had a property interest in their right to bring an indemnification suit for losses sustained in insuring the aircraft destroyed during a Libyan state-sponsored terrorist attack); accord Armstrong, 364 U.S. at 48-49 (recognizing that materialmen had a compensable property interest in their liens and that the Government's seizure of property subject to an unenforced lien abrogated the value of the lien and constituted a taking). See generally Emer de Vattel, The Law of Nations Bk. IV Ch. 2 § 12 at 435 (Béla Kapossy & Richard Whitmore eds. 2008) ("The necessity of making peace authori[z]es the sovereign to dispose of the property of individuals; and the eminent domain gives him a right to do it . . . . But as it is for the public advantage that he thus disposes of them, the state is bound to indemnify the citizens who are sufferers by the transaction.") (alteration in original).

As Justice Powell observed in his concurring opinion in Dames & Moore v. Regan, "[t]he Government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons and subject to the jurisdiction of our courts." 453 U.S. 654, 691 (1981) (Powell, J., concurring in part and dissenting in part) (internal quotation marks and footnote omitted).[5] Plaintiffs allege that this is precisely what occurred here, in that the Government furthered a foreign policy goal by normalizing diplomatic and legal relations with Libya, but in doing so, took the property interests of U.S. nationals in the form of their right to maintain claims for wrongful death or injury due to Libyan state-sponsored terrorism.

**Whether Plaintiffs Have Alleged Acts that Constitute a Taking**

Having found that the Plaintiffs alleged a cognizable property interest, this Court must determine whether Plaintiffs have alleged sufficient facts for the Court to find that the property interest was "taken." Acceptance Ins. Cos., 583 F.3d at 854. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005) (internal citations omitted). Defendant describes the alleged taking as the restoration of Libya's immunity from suit. This characterization of Plaintiffs' claim is too narrow, and ignores the gravamen of Plaintiffs' allegation that the United States' espousal of the judgment obtained by the plaintiffs in the Pugh action was a direct appropriation of their private property. In support of this allegation, Plaintiffs quote the Government's January 9, 2009 motion to intervene, emphasizing the Government's acknowledgment that "[i]n espousing the claims against Libya, the United States has made the plaintiffs' claims its own." Id. In essence, Plaintiffs claim that the Government transferred ownership of Plaintiffs' accrued cause of action to itself. Because Plaintiffs claim that the Government took their judgment and cause of action, and Federal Circuit precedent supports the conclusion that a cause of action is a property interest, Plaintiffs plausibly alleged a Fifth Amendment taking. Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1481; Aviation & Gen. Ins. Co., 121 Fed. Cl. at 362.[6]

---

[5] The rationale in Gray v. United States, 21 Ct. Cl. 340 (1886), an advisory opinion and not binding precedent, would also support a conclusion that Plaintiffs have stated a claim for a taking. See Gray, 21 Ct. Cl. at 390-93, 398-99 (concluding that the United States' renunciation of U.S. merchants' claims against France for losses stemming from France's seizure of U.S. merchant vessels to effect an international agreement constituted a taking).

[6] Defendant invokes Abrahim-Youri v. United States, 139 F.3d 1462 (Fed. Cir. 1997) to argue that there can be no taking of a claim when the Government substitutes one adjudicatory forum for another. Plaintiffs do not view the Government's settlement of their claims without their input as an adjudication by an alternative forum and squarely dispute Defendant's characterization of the Agreement. For purposes of deciding a Rule 12(b)(6) motion, the Court accepts Plaintiffs' characterization that their cause of action was compromised without their participation – not Defendant's contention that Plaintiffs' claim was adjudicated in a substitute forum. See Iqbal, 556 U.S. at 678.

Defendant attempts to muddy the issue by injecting a regulatory taking analysis into what should be an assessment of Plaintiffs' pleading – a Rule 12(b)(6) inquiry into whether Plaintiffs have stated a plausible claim for a Fifth Amendment taking.

Presuming the applicability of such a regulatory taking analysis, Defendant argues that even if Plaintiffs have a property interest in their judgment, the Court should find that no regulatory taking occurred. In its motion to dismiss, Defendant argues that the Government's espousal of the Alimanestianu family's claims did not constitute a taking, under the analytic framework in Penn Central Transportation Co. v. City of New York, which requires consideration of Plaintiffs' reasonable expectation, the character of the Government's conduct, and the economic impact on the claimants. 438 U.S. 104, 124 (1978).

In their response to Defendant's motion to dismiss, Plaintiffs argue that the Government's espousal of their claims against Libya was not a regulatory taking, but rather was a "per se" taking:

> [T]he Penn Central paradigm is inapplicable here because the government actually seized the property in question – a "classic taking" rather than a regulatory taking. Prior to the seizure, the Alimanestianu Plaintiffs held a judgment on appeal against the Libyan Defendants. After the seizure the judgment belonged to the United States. When an actual transfer is made from an individual to the government, the Supreme Court holds that the Fifth Amendment mandates the payment of just compensation[.]

Pls.' Resp. 18-19.

It would be premature to decide at this stage of the case whether Plaintiffs' allegations should be resolved under a "per se" takings analysis or the Penn Central test for regulatory takings. "While those factors may ultimately be relevant in deciding whether a taking has occurred, they do not assist the Court in deciding whether Plaintiffs have stated a plausible taking claim." Aviation & Gen. Ins. Co., 121 Fed. Cl. at 366. As in Aviation, Plaintiffs in this case "have pled that their legal causes of action against Libya were terminated by the Claims Settlement Agreement between the United States and Libya, as well as Executive Order 13477," and "[t]hese facts are sufficient to establish a claim for a taking by the United States Government for the public purpose of 'normalizing' relations between the United States and Libya." Id. See Iqbal, 556 U.S. at 663; Alliance of Descendants of Texas Land Grants, 37 F.3d at 1480-81.

**Whether Plaintiffs' Complaint Raises a Nonjusticiable Political Question**

When a complaint presents a question that is constitutionally assigned to a political department – as opposed to the judiciary – that question cannot be resolved before a court. Compare Nixon v. United States, 506 U.S. 224, 228-29 (1993) (holding that courts cannot review impeachment proceedings because Article I, Section 3 of the Constitution gives the Senate the "sole power to try all impeachments") with Baker v. Carr, 369 U.S. 186, 209, 226 (1962) (finding that Tennessee's failure to redraw legislative districts every 10 years gave rise to a justiciable question under the Fourteenth Amendment, since "the mere fact that the suit seeks protection of a political right does not mean it presents a political question.").

Defendant argues that the Court should dismiss this case on the ground that it presents a nonjusticiable political question. Defendant posits that Plaintiffs are attempting to second guess the President's authority to settle United States citizens' claims against Libya, stating that resolving Plaintiffs' claims "would undermine the President's ability to conduct foreign relations." Def.'s Mot. 19. Defendant invokes Shanghai Power Co. v. United States, where the plaintiff argued that the United States was required to pay the power company just compensation because the President should have negotiated a better settlement agreement with China. 4 Cl. Ct. 237, 248 (1983), aff'd, 765 F.2d 159 (Fed. Cir. 1985), cert. denied, 474 U.S. 909 (1985). In Shanghai Power, the Claims Court found that the question was nonjusticiable, in that political questions were implicated because the court was asked to review the merits of the President's settlement. Id.

Here, in contrast, Plaintiffs acknowledge "[n]either the merits of the Claims Settlement Agreement with Libya, nor the authority of the President to enter into the Claims Settlement Agreement and espouse claims against Libya is questioned." Pls.' Resp. 28. Plaintiffs allege that they had a property interest in their cause of action and trial court judgment, the Government's espousal of their claim constituted a per se Fifth Amendment taking, and the Government now owes Plaintiffs just compensation. This takings claim does not raise a nonjusticiable political question. See Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (recognizing that a takings claim for the expropriation of a United States citizen's property abroad is justiciable).

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is **DENIED**. The Court will convene a telephonic status conference on **November 17, 2015, at 11:00 a.m. EDT** to discuss scheduling further proceedings in this matter.

s/Mary Ellen Coster Williams  
**MARY ELLEN COSTER WILLIAMS**  
**Judge**