# In the United States Court of Federal Claims

No. 14-704C
(Filed: December 29, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| ALEXANDER ALIMANESTIANU, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Fifth Amendment Taking; Nonfinal Judgment; Property Interest; Settlement and Espousal of Claims Against Libya; <u>Per se</u> Taking; Regulatory Taking; <u>Penn Central</u> factors. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Richard N. Chassin</u>, <u>Michael Zeb Landsman</u>, and <u>Jesse T. Conan</u>, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Floor, New York, NY 10171, for Plaintiffs.

<u>Benjamin C. Mizer</u>, <u>Robert E. Kirschman, Jr.</u>, <u>Reginald T. Blades, Jr.</u>, and <u>L. Misha Preheim</u>, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

## OPINION AND ORDER[1]

**WILLIAMS**, Judge.

Plaintiffs in this Fifth Amendment taking case are family members of Mihai Alimanestianu, who was killed in 1989, when, in an act of state-sponsored terrorism, the Socialist People's Libyan Arab Jamairya ("Libya") bombed United Trans Aeriens Flight 772. Plaintiffs were awarded a nearly $1.3 billion judgment against Libya for the wrongful death of Mihai Alimanestianu. <u>Pugh v. Socialist People's Libyan Arab Jamahirya</u>, 530 F. Supp. 2d 216, 267-68 (D.D.C. 2008), <u>vacated</u>, Nos. 08-5387, 08-5388, 2009 WL 10461206, at \*1 (D.C. Cir. Feb. 27, 2009) (per curiam). Plaintiffs allege that the Government effected a taking by espousing and settling their claims with Libya and obtaining a vacatur of their judgment.

As part of the United States' settlement with Libya, Plaintiffs' claims were referred to the Foreign Claims Settlement Commission, and Plaintiffs received compensation of just over $10 million. Because Plaintiffs' settlement is far less than the $1.3 billion judgment they were awarded

---

[1] This is the second opinion in this action. On October 29, 2015, the Court denied Defendant's motion to dismiss. <u>Alimanestianu v. United States</u>, 124 Fed. Cl. 126 (2015).

in their District Court action, Plaintiffs assert that the United States owes them additional just compensation for taking their property.

This matter comes before the Court on Defendant's motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment. Because there are no genuine issues of material fact and Plaintiffs have failed to establish a compensable taking as a matter of law, Defendant's motion for summary judgment is granted.

## **Background**[2]

Plaintiffs are family members of Mihai Alimanestianu, who was killed in the 1989 explosion of United Trans Aeriens Flight 772 caused by Libya in an act of state-sponsored terrorism. Compl. ¶¶ 10-11. At the time of the explosion in 1989, there was no exception to the Foreign Sovereign Immunities Act ("FSIA") for state sponsors of terrorism, and Libya was immune from suit in the United States. In 1996, Congress amended FSIA to include an exception permitting claims for money damages for personal injury or death caused by acts of foreign sovereigns designated as state sponsors of terrorism. 28 U.S.C. § 1605(a)(7) (1996).

In 2002, Plaintiffs filed suit stemming from Mr. Alimanestianu's death in the United States District Court for the District of Columbia against Libya and six high-ranking Libyan officials.[3] On January 24, 2008, the District Court granted summary judgment in Plaintiffs' favor and on August 8, 2008, entered final judgment, awarding Plaintiffs approximately $1.3 billion.[4]

The defendants in the Pugh action filed a notice of appeal on August 14, 2008. Pugh v. Socialist People's Libyan Arab Jamahiriya, Nos. 08-5387, 08-5388 (D.C. Cir.) (consolidated). That same date, "[i]n order to further the process of normalization of relations" the United States entered into a "Claims Settlement Agreement" with Libya. Def.'s App. A1. The objective of the Agreement was to:

(1) Reach a final settlement of the Parties' claims and those of their nationals (including natural and juridical persons);

(2) Terminate permanently all pending suits (including suits with judgments that are still subject to appeal or other forms of direct judicial review); and

(3) Preclude any future suits that may be taken to U.S. and Libyan courts.

Id.

---

[2] This background is derived from Plaintiffs' Complaint and the appendices and exhibits to the parties' motions papers.

[3] The Libyan officials sued in their individual capacities were Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli.

[4] Plaintiffs were joined in the Pugh action by similarly situated parties. The total award to all Pugh plaintiffs was $6,903,683,445.

The Agreement established a humanitarian settlement fund. Id. at A2. The United States deposited $300 million into the fund which was to be used to compensate Libyan victims of United States airstrikes. Libya deposited $1.5 billion into the fund. Id. at A4. The $1.5 billion included "$681 million . . . to ensure fair compensation for the claims of nationals of the United States for wrongful death or physical injury in those cases described in the Act which were pending against Libya . . . as well as other terrorism-related claims against Libya." Id. at A6. Each country agreed to accept these funds "as a full and final settlement of its claims and suits and those of its nationals," and each party was required to "[s]ecure . . . the termination of any suits pending in its courts . . . (including proceedings to secure and enforce court judgments), . . . preclude any new suits in its courts," and restore "sovereign, diplomatic and official immunity to the other Party . . . ." Id. at A2.

In 2008, Congress enacted the Libyan Claims Resolution Act. Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA"). The LCRA codified the Agreement and provided that, upon the United States' receipt of funds pursuant to the Claims Settlement Agreement, sovereign immunity would be restored to Libya. Id. The LCRA provided that the funds had to be sufficient to ensure "fair compensation of claims of nationals of the United States for wrongful death or physical injury . . . ." Id.

On October 31, 2008, the Secretary of State certified receipt of the Libyan funds, and President George W. Bush issued Executive Order No. 13,477, providing that any pending suit by United States nationals and any pending suit in the United States by foreign nationals within the terms of the Claims Settlement Agreement – "including any suit with a judgment that is still subject to appeal . . . shall be terminated." Pls.' Mot. Ex. 5, at A99. The State Department established a fund to compensate individuals with wrongful death or personal injury claims against Libya caused by acts of state-sponsored terrorism and provided that the Foreign Claims Settlement Commission would adjudicate and render final decisions on claims of U.S. nationals referred to the Commission by the Secretary of State. 22 U.S.C. § 1623(a)(1)(C) (1998). The Commission was obligated to first apply the "provisions of the applicable claims agreement" and then apply "[t]he applicable principles of international law, justice, and equity." § 1623(a)(2).

At the time of the Claims Settlement Agreement, the enactment of the LCRA and the referral of claims to the Commission, the appeal in Pugh was proceeding in the United States Court of Appeals for the District of Columbia Circuit. On January 9, 2009, the United States filed a "motion to intervene, vacate judgment, and dismiss [the] suit with prejudice," arguing that, pursuant to the LCRA, the Claims Settlement Agreement, and Executive Order No. 13,477, U.S. Courts no longer had jurisdiction over terrorism-related claims against Libya. Pls.' Mot. Ex. 5, at A62-63. In its motion to intervene, the Government stated that it "espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims," and "made the plaintiffs' claims its own." Id. at A63. The Government further noted in this motion that administrative proceedings established by the Secretary of State for any terrorism-related injuries caused by Libya were available for U.S. nationals to seek compensation. Id. at A71-72.

On February 27, 2009, the D.C. Circuit granted the Government's motion to intervene, vacated the judgment in Pugh, and directed the District Court to dismiss the case. Pugh v. Socialist People's Libyan Arab Jamahiriya, 2009 WL 10461206, at *1. On March 6, 2009, the District Court dismissed the Pugh action with prejudice.

3

The State Department determined that a $10-million payment per death to the estates of individuals who died in acts of Libyan sponsored terror was fair compensation, and the estate of Mihai Alimanestianu received $10 million. Compl. ¶ 37. Following such payment to all of the estates, the State Department established seven additional categories of claims for referral. Pls.' Mot. Ex. 6, at A105-07. On December 11, 2008, pursuant to his discretionary authority under 22 U.S.C. § 1623(a)(1)(C), the legal advisor to the Secretary of State referred one category of claims (physical injury) to the Commission for adjudication and certification. Id. at A105. On January 15, 2009, the State Department sent a referral letter to the Commission, referring six additional categories of claims (Categories A, B, C, D, E, and F) and requesting that the Commission make determinations on those claims. Id.

Plaintiffs brought claims pursuant to Category B, which covered "claims of U.S. nationals for mental pain and anguish who are living close relatives of a decedent whose death formed the basis of a death claim compensated by the Department of State," and had been the subject of pending litigation against Libya that was dismissed. Id. at A106.

The Commission determined that Mihai Alimanestianu's children should receive $200,000 each. Compl. ¶ 37. The Commission denied compensation to the estates of Mihai Alimanestianu's brothers under Category B, because the brothers were not living at the time of the referral and to Ioana Alimanestianu, because as the beneficiary of the Estate of Mihai Alimanestianu, she was "eligible for compensation from the associated wrongful death claim." Pls.' Opp'n 10; Pls.' Mot. Ex. 6, at A106.

Plaintiffs, along with the other Pugh claimants, also sought additional compensation under Category C, permitting claimants with prior U.S. Court judgments to seek additional compensation, so long as the pending litigation against Libya had been dismissed. Pls.' Mot. Ex. 6, at A106. On May 16, 2012, the Commission denied the claims of all Category C claimants, concluding that no special circumstance warranted additional compensation. Def.'s App. A12. In a May 31, 2012 letter, Plaintiffs, along with other claimants, objected to the Commission's Proposed Decision, submitted a consolidated brief with supporting exhibits, and presented argument at an oral hearing the Commission held on the claimants' objections. Id. at A12-13.

On February 15, 2013, after it "reviewed all of the documents in the record and carefully considered claimants' arguments," the Commission issued a Final Decision, again denying the claimants' request for additional compensation. Id. at A11-A46. In its Final Decision, the Commission concluded:

- The Claims Settlement Agreement, the LCRA, and the Secretary of State's Certification of the agreement established that the parties to the Agreement intended it to "satisfy the compensatory expectations of the two groups of claimants [those with settlements and those with cases pending], identified in . . . the LCRA" and did not intend additional funds for those who had a prior court judgment;

- Because the Commission was tasked with determining whether the "mere existence" of a prior judgment entitled claimants to additional compensation, not whether a particular judgment warranted additional

4

>   compensation, the fact that claimants' damages exceeded the compensation they had received was irrelevant;
>
> - Claimants did not submit sufficient evidence indicating that the United States received extra funds from Libya because of their judgment; and
>
> - Claimants' assertion that their judgment was a "catalyst" for the Claims Settlement Agreement, enough to warrant additional compensation, was unpersuasive.

Id. at A37-38, A42-45.  Following the Commission's denial of their claims for additional compensation, Plaintiffs filed the instant action.

## Discussion

### Legal Standard for Summary Judgment

In granting a motion for summary judgment, a court must find that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute is one which "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit . . . ." Id. at 248. The moving party bears the burden of establishing the absence of any genuine issue of material fact. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. 256-57. When considering a motion for summary judgment, the court draws all factual inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391. At the summary judgment phase, the court may not weigh any evidence but only "determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.

### The Law of the Case Doctrine Does Not Apply

Plaintiffs assert that under the law of the case doctrine, the Court should not revisit its decision denying Defendant's motion to dismiss, finding that Plaintiffs had sufficiently plead a cognizable property interest. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (internal citation and quotation marks omitted). The purpose of the rule is to "encourage[] both finality and efficiency in the judicial process by preventing relitigation of already-settled issues." Banks v. United States, 741 F.3d 1268, 1276 (Fed. Cir. 2014).

However, as Defendant argues, a motion for summary judgment requires consideration of different "legally relevant factors" than a motion to dismiss. "An initial denial of a motion to dismiss does not foreclose, as the law of the case, the court's later consideration of those same claims on summary judgment." Athey v. United States, 123 Fed. Cl. 42, 50 (2015). As the Court explained in Gould, Inc. v. United States, the law of the case on a decision denying a dismissal is simply the Court's determination that a plaintiff's "allegations survive a motion to dismiss." 66 Fed. Cl. 253, 266 (2005). "Whether the merits of those very same claims survive summary judgment is an entirely different and undecided matter." Id. As such, the Court's denial of Defendant's motion to dismiss has no preclusive effect for purposes of the summary judgment phase of the case.

**Legal Standard for Fifth Amendment Taking**

On its face, the Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. The purpose of this prohibition is to bar the few from shouldering a burden that should be borne by the public as a whole. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 544 (2005) (noting that it is appropriate to inquire into whether plaintiffs have "been singled out to bear any particularly severe regulatory burden"); Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124 (1978) (stating that "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." (internal citation omitted)).

The Constitution "protects rather than creates property interests . . . ." Philips v. Wash. Legal Fund, 524 U.S. 156, 164 (1998). Consequently, to "define the dimensions of the requisite property rights for purposes of establishing a cognizable taking," courts look to "existing rules and understandings" and "background principles derived from an independent source, such as state, federal, or common law." Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)). "The concept of property for purposes of the [F]ifth [A]mendment has been interpreted broadly and can include 'every sort of interest the citizen may possess.'" Shanghai Power Co. v. United States, 4 Cl. Ct. 237, 240 (1983) (quoting United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945)).

When the Government takes private property pursuant to a public purpose, it must pay the owner just compensation. See Lingle, 544 U.S. at 538-39 (finding that "where [G]overnment requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation," and where regulations "completely deprive an owner of all economically beneficial us[e] of her property," the Government must pay just compensation (internal citations and quotation marks omitted)).

**Plaintiffs Have Not Established a Compensable Taking**

### **The Standard: Consideration of the Penn Central Factors is Appropriate**

The parties dispute whether Plaintiffs' takings claim should be analyzed as a per se taking or a regulatory taking. Plaintiffs allege that Defendant effected a per se taking of their property, which they characterize as their District Court judgment, when it settled their claims against Libya pursuant to the Claims Settlement Agreement for substantially less than their judgment and transferred their property to the Government. Plaintiffs assert that because they did not receive

6

just compensation from the United States as a result of the Settlement, they are entitled to $1,286,336,632, the approximate amount of their District Court judgment.

Defendant argues that the Penn Central factors, traditionally applied in the regulatory taking context, govern the Court's determination of whether the Government's espousal and settlement of the claims of United States nationals constitutes a compensable taking. Def.'s Mot. 12, 16-19. In a takings analysis under Penn Central, the Court examines 1) the extent to which the Government's action interfered with the plaintiffs' reasonable investment-backed expectations; 2) the character of the Government's action; and 3) the economic impact of that action on the plaintiffs.

The Federal Circuit in Abraham-Youri v. United States, recognizing the dichotomy between the legal standards governing per se and regulatory takings, provided guidance on the analytical construct governing takings involving Government claim espousal in the foreign claims settlement context. 139 F.3d 1462, 1465-68 (Fed. Cir. 1997). In Abraham-Youri, the United States and Iran entered into a Settlement Agreement, under which the United States espoused the small claims of U.S. nationals and later referred those claims to the Commission for consideration and payment. However, in paying the claims, the Commission did not award full interest, and the plaintiffs filed a takings action seeking their unawarded interest. Id. at 1465.

The Federal Circuit in Abraham-Youri characterized the plaintiffs' causes of action against Iran as "property rights" and acknowledged that these property rights were extinguished (not simply regulated) when the Government espoused and settled their claims.[5] However, the Circuit concluded that a mechanistic application of a per se takings analysis was not appropriate given the nature of the property interest and the context in which the taking occurred. The Abraham-Youri Court found that, even though the plaintiffs had superficially met the factors in a strict per se analysis, i.e., they had established a property interest that was "extinguished" and did not receive the full value of that property, there was no compensable taking. See id. at 1466-67.

Without concluding that the Government's espousal and settlement of the Abraham-Youri plaintiffs' claims constituted a regulatory taking, the Circuit nonetheless pragmatically looked to the Penn Central factors as relevant to its analysis. See id. 1465-66. The Court found the Penn

---

[5] Defendant invokes Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004), to argue that Plaintiffs' District Court judgment does not constitute a cognizable property interest. The Adams plaintiffs asserted that they had a cognizable property interest both in payment of underpaid overtime compensation under the Fair Labor Standards Act ("FSLA") and in their administrative claim before the General Accounting Office ("GAO") to recover such overtime compensation. The Federal Circuit found that the Adams plaintiffs did not have a property interest in their GAO claim because the underlying subject matter of this claim - - entitlement to statutory compensation - - failed to qualify as a recognized property interest. Id. at 1226.

Adams is inapposite because the Adams plaintiffs' cause of action only protected a statutory entitlement to money. In this Court's view, Adams does not impact Abraham-Youri's dicta that a cause of action against a foreign government that the United States Government espoused as its "claim" and settled, was a property interest. However, in any event, as explained below, even assuming arguendo that Plaintiffs here have a cognizable property interest, there was no compensable taking.

7

Central factors relevant, recognizing that "takings claims . . . come in a variety of forms arising from a variety of fact patterns, some of which fit less than comfortably into the regulatory or physical takings dichotomy." Id. at 1466 (internal citations omitted). In so holding, the Federal Circuit rejected the Abrahim-Youri plaintiffs' "syllogism" that because they had a property interest, and the Government took their property and undervalued it, those plaintiffs were necessarily entitled to compensation for such taking. Id. at 1465-66.

Given the striking similarities between Abrahim-Youri and the instant case, this Court, consistent with Abrahim-Youri, considers the Penn Central factors as relevant in assessing whether Plaintiffs established a compensable taking.

**The Extent to Which the Government's Actions Interfered with Plaintiffs' Expectations**

In both Abrahim-Youri and the instant case, the plaintiffs claimed a taking based on the United States Government's espousal of its nationals' claims against a foreign government and settlement of those claims for less than their alleged full value. In Abrahim-Youri, the Federal Circuit examined the plaintiffs' reasonable expectations in their choses in action against Iran and determined that although the plaintiffs' choses in action were extinguished, "the Government provided an alternative tailored to the circumstances which produced a result as favorable to the plaintiffs as could reasonably be expected." Id. at 1468.

Similarly here, Plaintiffs had no reasonable expectation for recovery greater than what they received from the State Department and the Commission. After Defendant espoused Plaintiffs' claims pursuant to the Claims Settlement Agreement, Mihai Alimanestianu's estate received $10 million from the settlement fund, and the children of Mihai Alimanestianu received $200,000 each.

In contrast to this actual recovery, Plaintiffs, at the time of Libya's terrorist act, had no reasonable expectation of any recovery at all. Because the jurisdictional rules abrogating Libya's sovereign immunity were enacted after Libya's terrorist act, Plaintiffs could not have sued Libya at the time of the injury or have had any expectation of monetary relief from Libya at that time. Cf. Republic of Iraq v. Beaty, 556 U.S. 848, 865 (2009) (stating, in a non-takings context, that "[t]he President's elimination of Iraq's later subjection to suit could hardly have deprived respondents of any expectation they held at the time of their injury that they would be able to sue Iraq in United States courts" (emphasis in original)). In addition, even after succeeding in their District Court action, Plaintiffs had no reasonable expectation to secure monetary payment from Libya for their claims. Plaintiffs' ability to secure payment was speculative and would have depended upon Plaintiffs' ability to enforce and collect their United States court judgment in Libya. In short, Plaintiffs lacked a realistic expectation of actually collecting their $1.3 billion judgment. As such, the Government's actions in espousing and settling their claims did not interfere with Plaintiffs' reasonable expectations in their cause of action, vacated judgment and claims against Libya.

**The Character of the Government Action**

Permeating the character of the Government actions here are the Government's conduct of foreign relations and exercise of its executive authority to compromise claims of its nationals against foreign governments to further national interests. The context in which the Government

conduct here occurred is an important factor. That context of conducting international affairs colors both the extent of the property interests Plaintiffs have and the reasonableness of any expectations that a taking of these interests would give rise to compensation. Plaintiffs' property interests in their causes of action against foreign governments are necessarily constrained by their own Government's paramount right to conduct foreign affairs and concomitant right to compromise its nationals' claims in the process.

As the Federal Circuit clarified in Abraham-Youri:

> Certain sticks in the bundle of rights that are property are subject to constraint by the government, as part of the bargain through which the citizen otherwise has benefit of government enforcement of property rights. As the trial court correctly observed, those who engage in international commerce must be aware that international relations sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity.

139 F.3d at 1468.

The very real potential that the Government might have had to compromise individual nationals' claims against Libya diminishes any reasonable expectation that Plaintiffs would receive full compensation for their claims. As the Supreme Court recognized, "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns . . . [and] nations have often entered into agreements settling the claims of their respective nationals." Dames & Moore v. Regan, 453 U.S. 654, 679 (1981) (internal citation omitted).

Further, Plaintiffs brought their suit pursuant to the State Sponsor of Terrorism exception to FSIA and the Government's designation of Libya as a state sponsor of terror, which permitted suit against Libya - - a somewhat tenuous jurisdictional grant which could have been (and later was) eliminated by the United States. See Beaty, 556 U.S. at 864-65 (noting that as foreign sovereign immunity "'reflects current political realities and relationships,' . . . [it] generally is not something on which parties can rely 'in shaping their primary conduct.'" (quoting Republic of Austria v. Altmann, 541 U.S. 677, 696 (2004))); see also Shanghai Power, 4 Cl. Ct. at 244. Given this landscape, Plaintiffs had no reasonable expectation that they would receive the full quantum of their District Court judgment in satisfaction of their claims against Libya.

**The Economic Impact of the Government's Conduct on Plaintiffs' Property Rights**

The Government's conduct benefited Plaintiffs economically here. The estate received $10 million and each child received $200,000. See Belk v. United States, 858 F.2d 706, 709 (Fed. Cir. 1988) ("'[W]here, as here, the private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public.'" (alteration in original) (quoting Nat'l Bd. of Young Men's Christian Ass'ns v. United States, 395 U.S. 85, 92 (1969))).

9

Here, as in Abrahim-Youri, the Government's action in espousing and settling Plaintiffs' claims gave Plaintiffs as much compensation as they likely would have secured had they been left to their own devices. As the Federal Circuit recognized:

> Here, though the choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected.

139 F.3d at 1468.

It is speculative whether Plaintiffs would have secured any recovery from Libya absent the Government's espousal and settlement of their claims. See United States v. Sperry Corp., 493 U.S. 52, 63 (1989) (stating that plaintiff "benefit[ed] directly from the existence and functions of the Tribunal" because it "assured [plaintiff] that any award made to it, whether as the result of a settlement or otherwise, could be enforced in the courts of any nation and actually paid in this country"). When Plaintiffs' $1.3 billion District Court judgment was espoused, it was still on appeal, and no property had been attached. Here, as in Sperry, Plaintiffs' judgment was not "readily collectible." 493 U.S. at 63 (stating that "[h]ad the President not agreed to the establishment of the Tribunal and the Security Account, [plaintiff] would have had no assurance that it could have pursued its action against Iran to judgment or that a judgment would have been readily collectible."); see In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 49 (D.D.C. 2009) (discussing the "number of practical, legal, and political obstacles [which] have made it all but impossible for plaintiffs in these FSIA terrorism cases to enforce their default judgments against Iran").

As the United States Court of Appeals for the First Circuit observed:

> There may well be situations when the President's extinction or "settlement" of a claim against a foreign government, without the consent of the claimant, would constitute a "taking" of private property for public "use." Here, of course, the President has not "extinguished" [Appellant's] claim, but has provided alternative means for its resolution and satisfaction. Thus, his actions could at very most constitute a "taking" of property only if the alternative method of satisfying the claim (i.e., submission to the Tribunal) is demonstrably and measurably inferior to the rights otherwise available to [Appellant] (i.e., the right to attempt to obtain an unsecured judgment in federal court).

Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth., 651 F.2d 800, 814-15 (1st Cir. 1981). It cannot be said that the alternative forum provided to Plaintiffs here was "demonstrably and measurably inferior" to Plaintiffs' right to pursue their claims against Libya in federal court and attempt to enforce any judgment sustained on appeal.

Plaintiffs' dissatisfaction with the settlement amount negotiated by the Government and the compensation awarded by the Commission do not establish a compensable taking. See Abrahim-Youri, 139 F.3d at 1468 ("[T]he fact that plaintiffs are not satisfied with the settlement negotiated by the Government on their behalf does not entitle them to compensation by the United States.").

10

**Conclusion**

Defendant's motion for summary judgment is **GRANTED**.

Plaintiffs' cross-motion for partial summary judgment is **DENIED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**
